STATE OF NORTH CAROLINA v. DEREK LAJUAN REID AND FRED POITIER ADAMS

No. 150A93

(Filed 4 March 1994)

**1. Assault and Battery § 26 (NCI4th)— aggravated assault— defendant as perpetrator—sufficiency of evidence**

There was sufficient evidence from which the jury could reasonably infer that defendant shot the victim with a deadly weapon with the intent to kill inflicting serious injury where the evidence tended to show that, on the night of the shooting at a club, three bullets were fired from a .357 Magnum revolver, two from a .38-caliber revolver, and one from a security officer's .40-caliber handgun; defendant testified that he was holding and fired the .38; he shot in response to a companion's instruction to "shoot the mother f---er"; the club was searched by crime scene technicians immediately after the incident occurred; three bullets identified as coming from the .357 Magnum and one bullet fired from the officer's .40-caliber handgun were recovered; no bullets were recovered that were identified as being shot from the .38; one bullet and fragments of another bullet remained unidentified in the victim's body; and the victim sustained near fatal injuries but survived.

**Am Jur 2d, Assault and Battery §§ 92 et seq.**

**2. Assault and Battery § 13 (NCI4th)— aggravated assault— acting in concert—sufficiency of evidence**

There was sufficient evidence from which the jury could find that defendant was guilty of assault with a deadly weapon with intent to kill inflicting serious injury on the theory that defendant was acting in concert with the codefendant who actually shot the victim where the evidence tended to show that defendant, the codefendant and three companions went to a bar together; one companion and the victim's cousin got into an argument over a girl and the victim also harassed the companion; defendant and the codefendant left the bar and returned within a few minutes; the codefendant had kept a gun in his car in the past; defendant, the codefendant, the companion and some other men approached the victim and a group of men sitting at a table; the victim stated, "I thought this was over with"; defendant's companion said, "we're going

to settle this," at which point a member of the victim's group picked up a chair and advanced on defendant's group; defendant's companion then shouted, "shoot the mother f---er," and defendant and the codefendant pulled out guns and began shooting; there was testimony that it was possible that the victim was shot by a .357 Magnum revolver; after the shooting, the codefendant fled to a bathroom where the .357 Magnum was later found; and the victim told witnesses that the codefendant shot him.

**Am Jur 2d, Assault and Battery §§ 8 et seq.**

3. **Criminal Law § 47 (NCI4th) — aggravated assault — acting in concert — codefendant acquitted — inconsistent verdicts permissible**

Defendant could properly be convicted of assault with a deadly weapon with intent to kill inflicting serious injury under the theory that he acted in concert with the codefendant even though the codefendant was acquitted of that crime since inconsistent verdicts in the same trial are permissible.

**Am Jur 2d, Criminal Law § 167.**

4. **Evidence and Witnesses §§ 870, 942 (NCI4th) — statement before shooting — not hearsay — excited utterance**

Testimony by an assault victim that defendants' companion yelled "shoot the mother f---er" just before defendants drew their guns and began shooting was not inadmissible hearsay since the testimony was admitted to establish why defendants began shooting and to show the context in which the shooting began. Even if the statement was hearsay, it was admissible under the "excited utterance" exception to the hearsay rule where it was made when someone with whom the companion had been arguing came toward him holding a bar chair in the air.

**Am Jur 2d, Evidence §§ 497 et seq.; Homicide § 334.**

5. **Evidence and Witnesses § 1331 (NCI4th) — in-custody statement — waiver of juvenile and Miranda rights**

There was ample evidence to support the trial court's findings of fact, and those findings support the court's conclusion that defendant voluntarily waived his juvenile and *Miranda*

rights and that the statement that he gave thereafter to the police was freely, voluntarily, and understandingly given.

**Am Jur 2d, Evidence § 585.**

6. **Homicide § 253 (NCI4th)— first-degree murder — sufficient evidence of premeditation and deliberation**

The State presented sufficient evidence of premeditation and deliberation to support defendant's conviction of first-degree murder where its evidence tended to show that defendant, the codefendant, and three others went to a bar together; one of defendant's companions and the victim got into an argument over a girl; after the argument, defendant and the codefendant left the bar and returned a few minutes later; defendant was known in the past to have put a .357 Magnum in his car in the parking lot of the bar; defendant's group approached the victim and his group; the victim picked up a chair and swung it at defendant's companion, who yelled, "shoot the mother f—er"; defendant pulled out his gun and began firing; at the time defendant fired his gun, he was holding his arm straight out and pointing it into the crowd where the victim was standing; and the gun that fired the bullet which killed the victim was identified as the gun being held by defendant on the night of the murder.

**Am Jur 2d, Homicide § 439.**

7. **Homicide § 489 (NCI4th)— premeditation and deliberation — lack of provocation by "defendant" — lapsus linguae — no plain error**

The trial court's *lapsus linguae* in instructing the jury that it could infer premeditation and deliberation from lack of provocation by the "defendant" rather than by the "victim" did not constitute plain error where the trial court's instructions as a whole indicated that provocation on the part of the "victim" was the relevant inquiry; the court instructed on voluntary manslaughter, which clearly indicated that provocation on the part of the victim was at issue; and the trial court corrected its mistake when it gave the same instruction to the jury for the codefendant.

**Am Jur 2d, Homicide § 501.**

**8. Homicide § 489 (NCI4th)— premeditation and deliberation— lack of provocation—instruction supported by evidence**

The trial court's instruction that the jury could infer premeditation and deliberation from lack of provocation by the victim was supported by the evidence in that there was evidence that the murder victim did not provoke defendant where there was evidence that it was another person, not the victim, who wielded a chair and that the chair was thrown toward defendant's companion, not toward defendant; and there was evidence that defendant approached the victim and initiated the fight, and that the victim's group was sitting down talking when defendant's group approached them.

**Am Jur 2d, Homicide § 501.**

**9. Homicide § 493 (NCI4th)— first-degree murder—instructions— premeditation and deliberation—lack of provocation—legal provocation reducing murder to manslaughter**

The trial court's instruction in a first-degree murder trial that premeditation may be proven by lack of provocation, when coupled with the trial court's subsequent charge on voluntary manslaughter and the definition of legal provocation which will reduce murder to manslaughter, could not have misled the jurors to believe that they must find legal provocation to negate premeditation and deliberation.

**Am Jur 2d, Homicide § 501.**

**10. Homicide § 609 (NCI4th)— first-degree murder—insufficient evidence of self-defense—mistakes in gratuitous instructions— harmless error**

Defendant was not entitled to an instruction on either perfect or imperfect self-defense in a first-degree murder trial because he presented no evidence that he believed it was necessary to kill the victim in order to save himself from death or great bodily harm, and any mistakes in the trial court's gratuitous self-defense instructions were harmless error, where defendant said he had no fear of death and that he never shot at the victim or went near him; defendant's whole case was based on the theory that he shot at the floor when a fight began and that if he did shoot the victim, it was an accident; defendant never stated that he feared for his life; and no other evidence was presented that defendant shot the

STATE v. REID

[335 N.C. 647 (1994)]

victim because he feared for his life. Defendant's testimony showing that he had some vague and unspecified nervousness or fear due to the fighting that was going on around him was insufficient to justify an instruction on self-defense.

**Am Jur 2d, Homicide §§ 519 et seq.**

11. **Homicide § 620 (NCI4th) — first-degree murder — imperfect self-defense — first-aggressor theory — instructions as harmless error**

Any error by the trial court in instructing the jury in a first-degree murder trial on the first-aggressor theory of imperfect self-defense was harmless where (1) defendant never presented any evidence that he acted under a reasonable belief that it was necessary to kill in order to save himself from death or great bodily harm and was thus entitled to no instruction on self-defense, and (2) the jury found defendant guilty of first-degree murder and thus found that the killing was without just cause or excuse and with malice.

**Am Jur 2d, Homicide §§ 519 et seq.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment entered by Johnston, J., at the 28 September 1992 Criminal Session of Superior Court, Mecklenburg County, sentencing defendant Fred Poitier Adams to life imprisonment upon his conviction of first-degree murder. Defendant Derek Lajuan Reid's motion to bypass the Court of Appeals as to a conviction for assault with a deadly weapon with intent to kill inflicting serious injury was allowed by the Supreme Court on 16 April 1993. Heard in the Supreme Court 15 November 1993.

*Michael F. Easley, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Isabel Scott Day, Public Defender, by Julie Ramseur Lewis, Assistant Public Defender, for defendant-appellant Reid.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant Adams.*

MEYER, Justice.

On 27 January 1992, a Mecklenburg County grand jury indicted defendants, Fred Poitier Adams and Derek Lajuan Reid, for the

first-degree murder of Delancey Wilkes and for the assault with a deadly weapon with intent to kill inflicting serious injury of Antwane Drakeford. Defendants were tried jointly and noncapitally at the 28 September 1992 Criminal Session of Superior Court, Mecklenburg County. On 6 October 1992, the jury returned verdicts finding defendant Adams guilty of the first-degree murder of Delancey Wilkes and defendant Reid guilty of assault with a deadly weapon with intent to kill inflicting serious injury upon Antwane Drakeford. The trial court sentenced defendant Adams to life imprisonment for the murder conviction and imposed a six-year sentence on defendant Reid for the assault conviction. Defendant Adams appeals to this Court as of right from the judgment sentencing him to life imprisonment. Defendant Reid was allowed to bypass the North Carolina Court of Appeals on his conviction of assault with a deadly weapon with intent to kill inflicting serious injury.

The evidence presented at defendants' trial tended to show the following. On the night of 8 January 1992, defendant Fred Adams, defendant Derek Reid, Brian Moore, Brian White, and Chris Roach went to the Casanova Club. At some point in the evening, Chris Roach and Bernard Wilkes, the decedent, got into an argument. The testimony of numerous witnesses as to what happened after this initial argument between the decedent and Chris Roach is not clear. What is uncontradicted is that at the end of the evening, Bernard Wilkes had been shot and killed by a bullet from a .357 Magnum revolver, and Antwane Drakeford had been seriously wounded by two gunshots.

Some time after Chris Roach argued with Bernard Wilkes, defendant Adams talked with Roach; Adams and defendant Reid then left the club, returning a few minutes later. Adams, Reid, Roach, and some other men then approached Drakeford, Wilkes, and some others. Drakeford said, "I thought this was over with," to which Roach replied, "we're going to settle this." At this point, someone in the Drakeford/Wilkes group picked up a bar chair and wielded it toward the Adams/Reid group. Chris Roach then shouted, "shoot the mother f---er," and Adams and Reid pulled guns and began shooting.

Officer Stith, a security guard on duty outside the club, testified that he ran into the club and saw a chair in the air and Adams and Reid with guns. The security guard stated that he shot his .40-caliber handgun one time in the general direction of Adams

STATE v. REID

[335 N.C. 647 (1994)]

and told everyone to freeze and drop their weapons. Stith testified that Reid followed his instructions, but Adams ran into the men's bathroom. A .38-caliber revolver was found on the floor close to where Reid was standing when Stith first observed him. A .357 Magnum revolver, later identified as the murder weapon, was found in a toilet in the bathroom into which Adams had run.

It was determined that the bullet that killed Bernard Wilkes came from the .357 Magnum revolver found in the toilet. It was not possible to determine what type of bullet struck Drakeford nor from what gun the bullets came, as doctors were unable to remove the bullets from Drakeford's body. Drakeford believed Adams shot him, but there was also testimony that Drakeford had his back to his assailant when he was shot and thus could not have actually seen who shot him.

There was expert testimony that three bullets were fired from the .357 Magnum revolver, two from the .38-caliber revolver, and one from the security guard's .40-caliber handgun. Three bullets from the .357 Magnum found in the bathroom were recovered; a bullet and casing from Officer Stith's .40-caliber handgun were also recovered. No bullets that were identified as coming from the .38 were recovered.

Additional facts will be discussed as necessary for the proper disposition of the issues raised by defendants.

Defendant Reid first argues that the trial court erred in failing to dismiss the charge of assault with a deadly weapon with intent to kill inflicting serious injury because the evidence was insufficient to convict defendant of the charge, first, on the basis that it failed to show that he was the one who actually shot Drakeford and, second, that it failed to show that he and defendant Adams were acting in concert. The State argues that there was sufficient evidence from which the jury could find either that defendant was guilty of assault with a deadly weapon with intent to kill inflicting serious injury or that defendant was guilty of the crime on the theory that Adams shot Drakeford and that Reid was acting in concert with Adams.

We note that the principles that guide us when we consider a defendant's motion to dismiss based on the insufficiency of the evidence are well settled.

The evidence is to be viewed in the light most favorable to the State. *State v. Thomas*, 296 N.C. 236, 250 S.E.2d 204 (1978). All contradictions in the evidence are to be resolved in the State's favor. *State v. Brown*, 310 N.C. 563, 313 S.E.2d 585 (1984). All reasonable inferences based upon the evidence are to be indulged in. *Id.* Our cases also establish that defendant's evidence may be considered on a motion to dismiss where it clarifies and is not contradictory to the State's evidence or where it rebuts permissible inferences raised by the State's evidence and is not contradictory to it. *State v. Bates*, 309 N.C. 528, 308 S.E.2d 528 (1983); *State v. Bruton*, 264 N.C. 488, 142 S.E.2d 169 (1965). The same principle obtains where, as here, the defendant's statement is introduced by the State. *State v. Todd*, 222 N.C. 346, 23 S.E.2d 47 (1942). Finally, while the State may base its case on circumstantial evidence requiring the jury to infer elements of the crime, that evidence must be real and substantial and not merely speculative. Substantial evidence is evidence from which a rational trier of fact could find the fact to be proved beyond a reasonable doubt. *State v. Pridgen*, 313 N.C. 80, 326 S.E.2d 618 (1985); *State v. Jones*, 303 N.C. 500, 279 S.E.2d 835 (1981).

*State v. Reese*, 319 N.C. 110, 138-39, 353 S.E.2d 352, 368 (1987).

[1] Defendant was charged and convicted of assault with a deadly weapon with intent to kill inflicting serious injury, in violation of N.C.G.S. § 14-32(a). The essential elements of the crime are (1) an assault, (2) with a deadly weapon, (3) with intent to kill, (4) inflicting serious injury, (5) not resulting in death. *State v. Meadows*, 272 N.C. 327, 331, 158 S.E.2d 638, 640 (1968); *State v. Cain*, 79 N.C. App. 35, 46, 338 S.E.2d 898, 905, *disc. rev. denied, stay denied*, 316 N.C. 380, 342 S.E.2d 899 (1986). "Before the issue of a defendant's guilt may be submitted to the jury, the trial court must be satisfied that substantial evidence has been introduced tending to prove each essential element of the offense charged and that the defendant was the perpetrator." *State v. Barts*, 316 N.C. 666, 686, 343 S.E.2d 828, 841 (1986). We conclude that there was substantial evidence from which the jury could reasonably infer that defendant Reid shot Antwane Drakeford with a deadly weapon, with the intent to kill, inflicting serious injury.

Evidence was presented that three guns were fired that night, a .38-caliber revolver, a .357 Magnum revolver, and a .40-caliber

STATE v. REID

[335 N.C. 647 (1994)]

handgun. There was testimony that three bullets were fired from the .357, two from the .38, and one from the .40. Derek Reid testified that he was holding the .38 and that he fired the .38. There was evidence that he shot in response to Roach's instruction to "shoot the mother f---er." The club was thoroughly searched by the crime scene technicians immediately after the incident occurred; three bullets identified as coming from the .357 Magnum were recovered, and one bullet fired from Officer Stith's .40-caliber handgun was recovered. No bullets were recovered that were identified as being shot from the .38. One bullet and bullet fragments of another bullet remained unidentified in Drakeford's body. Drakeford sustained near fatal injuries but survived.

From this evidence, a rational trier of fact could have determined that Reid assaulted Drakeford by shooting him; that the assault was with a deadly weapon, a .38-caliber revolver; that he had the intent to kill as he responded to Roach's instruction to shoot; and that Drakeford suffered serious injury not resulting in death.

[2] There is also evidence that defendant Reid is guilty of assault with a deadly weapon with intent to kill inflicting serious injury on the basis that he acted in concert with Adams, who was the other potential gunman.

In *State v. Joyner*, 297 N.C. 349, 255 S.E.2d 390 (1979), we concluded:

> It is not . . . necessary for a defendant to do any particular act constituting at least part of a crime in order to be convicted of that crime under the concerted action principle so long as he is present at the scene of the crime and the evidence is sufficient to show he is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime.

*Id.* at 357, 255 S.E.2d at 395; *see also State v. Wilson*, 322 N.C. 117, 141, 367 S.E.2d 589, 603 (1988).

In this case, the evidence taken in the light most favorable to the State shows that Reid, Adams, Roach, Moore, and White came to the bar together; that Roach and Wilkes got into an argument over a girl; and that Drakeford, Wilkes' cousin, also harassed

STATE v. REID

[335 N.C. 647 (1994)]

Roach. After Roach and Wilkes exchanged words, Reid and Adams left the bar together, returning within a few minutes. Testimony indicated that Adams, in the past, had kept a gun in his car. Reid, Adams, Roach, and some other men then approached Wilkes, Drakeford, and some other men sitting at the table with Wilkes and Drakeford. Drakeford said, "I thought this was over with"; then Chris Roach said, "we're going to settle this," at which point a member of the Wilkes/Drakeford group picked up a chair and advanced on the Reid/Adams group. Roach then shouted, "shoot the mother f---er," and Reid and Adams pulled guns out and began shooting.

This evidence supports the argument that Reid and Adams were acting in concert in accordance with a common plan or scheme. A rational juror could find, based on the evidence presented, that Reid and Adams had decided to shoot Wilkes and Drakeford after Roach had argued with the two men. Reid and Adams left the bar together to get their weapons; after they returned, they approached Wilkes and Drakeford, and upon Roach's command, pulled their guns and shot Wilkes and Drakeford.

There was also evidence that it was defendant Adams who actually shot Drakeford. Adams was supposedly holding the .357 Magnum revolver recovered from the crime scene, there was testimony that it was possible Drakeford had been shot by a .357, and Drakeford told witnesses that Adams had shot him.

Finally, there was also evidence that Adams was holding the .38-caliber revolver. If the jury believed that he was shooting this weapon, then it could have believed that he shot Drakeford under the theory that it was the unrecovered bullets from the .38 that wounded Drakeford.

Because of the numerous different accounts of the events that night, presented by the State's evidence and examination of the defense witnesses, it is possible that a rational juror, in interpreting the evidence presented at trial, could have found Reid guilty of assault with a deadly weapon with intent to kill inflicting serious injury, either because the juror believed the evidence proved that Reid shot Drakeford or because he believed that Adams shot Drakeford but that Reid was "acting in concert" with Adams.

[3] Defendant next argues that his motion to dismiss should have been granted, contending that he could not have been found guilty

of assault with a deadly weapon with intent to kill inflicting serious injury under the concerted action principle because defendant Adams was not convicted of assault with a deadly weapon with intent to kill inflicting serious injury. The State argues that there is sufficient evidence for the conviction to stand and that this Court in the past has allowed a coprincipal to be convicted of a crime for which another principal has been acquitted. *State v. Beach*, 283 N.C. 261, 196 S.E.2d 214 (1973), *overruled on other grounds by State v. Adcock*, 310 N.C. 1, 310 S.E.2d 587 (1984).

We hold that the trial court did not err in allowing the conviction to stand. In *State v. Beach*, a defendant moved to dismiss charges pending against him on the grounds that he was being tried as an aider and abettor of certain crimes and that the principal had been tried and acquitted of the charges upon which defendant's indictments were based. In *Beach*, we noted that "where one principal has been acquitted at a former trial it was no bar to the trial of the others who were indicted as principals." *Id.* at 269, 196 S.E.2d at 220. "The fact that one mistakenly supposed to have committed a crime was tried therefor and acquitted does not affect the guilt of one proven to have been present aiding and abetting, so long as it is established that the crime was committed by someone." *Id.* The decision in *Beach* was based on a theory first enunciated in 1893 in *State v. Whitt*, 113 N.C. 716, 18 S.E. 715. *Whitt* held that a principal in the second degree, or an aider and abettor, could be convicted even if the principal in the first degree, the one actually perpetrating the crime, had been acquitted. *Id.* at 719-20, 18 S.E. at 716. The issue of what to do in this particular situation, where there are inconsistent jury verdicts among coprincipals in the same trial, has not been previously addressed by this Court; however, our research reveals that the United States Supreme Court has a long-standing rule that allows inconsistent jury verdicts from the same trial to stand.

The rule was first set forth in *Dunn v. United States*, 284 U.S. 390, 76 L. Ed. 356 (1932). In *Dunn*, the Court held that a criminal defendant convicted on one count could not attack that conviction because it was inconsistent with the jury's acquittal of the same defendant on another count. *Id.* at 393-94, 76 L. Ed. at 358-59, *cited in United States v. Powell*, 469 U.S. 57, 59, 83 L. Ed. 2d 461, 464 (1984). The Supreme Court has used the reasoning of *Dunn* to uphold inconsistent verdicts among codefendants. *United States v. Dotterweich*, 320 U.S. 277, 279, 88 L. Ed. 49, 50, *reh'g*

*denied*, 320 U.S. 815, 88 L. Ed. 492 (1943). In *Dotterweich*, the Court held that the president and general manager of a corporation could be found guilty of a violation of the federal Food, Drug and Cosmetic Act even though the corporation, which was a codefendant, was acquitted. "Whether the jury's verdict was the result of carelessness or compromise. or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation[ ] is immaterial. Juries may indulge in precisely such motives or vagaries." *Id.* at 279, 88 L. Ed. at 50-51; *see also Harris v. Rivera*, 454 U.S. 339, 345, 70 L. Ed. 2d 530, 535 (1981) (in criminal case tried without a jury, the facially inconsistent verdicts acquitting one codefendant while convicting two others was upheld; "Inconsistency in a verdict is not a sufficient reason for setting it aside" even if the inconsistency is the result of lenity on the part of the trial judge).

The most recent case enunciating the reason for allowing inconsistent verdicts in the same trial convinces us that the rule should be adopted for the case before us. In *United States v. Powell*, 469 U.S. 57, 83 L. Ed. 2d 461, decided in 1984, a defendant had been acquitted of the charge of conspiracy to possess with the intent to distribute cocaine. *Id.* at 60, 83 L. Ed. 2d at 465. The defendant was also acquitted of the charge of possession with intent to distribute cocaine. However, she was convicted of facilitating the commission of certain felonies. The felonies she was charged with facilitating were the two felonies she had been acquitted of: "conspiracy to possess with intent to distribute cocaine" and "possession with intent to distribute cocaine." *Id.* Defendant appealed her conviction, arguing that the verdicts were inconsistent, as she had been acquitted of the charges upon which her facilitating conviction was based. Defendant argued that she was entitled to reversal of her facilitating conviction because of the inconsistency. *Id.*

The Supreme Court concluded that inconsistent verdicts in a criminal trial need not be set aside, but may instead be viewed as a demonstration of the jury's lenity. *Id.* at 65, 83 L. Ed. 2d at 469. The *Powell* Court noted that in *Dunn*, Justice Holmes had stated that:

> "Consistency in the verdict is not necessary. . . . The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the [jurors] did not

**STATE v. REID**

[335 N.C. 647 (1994)]

speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."

*Id.* at 62-63, 83 L. Ed. 2d at 467 (quoting *Dunn*, 284 U.S. at 393, 76 L. Ed. at 358-59).

The Supreme Court concluded that the rule that a defendant may not upset such an inconsistent verdict embodies acknowledgment of a number of factors. *Id.* at 65, 83 L. Ed. 2d at 468. The acquittal may represent the mistake of the jury due to "compromise[ ] or lenity." *Id.* If this is true, "the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause." *Id.*

"The fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable." *Id.* at 66, 83 L. Ed. 2d at 469.

The United States Supreme Court also rejected as "imprudent and unworkable a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them." *Id.* The Court felt it was simply too difficult to tell exactly what the jury was thinking. *Id.*

Finally, the United States Supreme Court noted that

a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. . . . Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the

jury could rationally have reached a verdict of guilt beyond a reasonable doubt.

*Id.* at 67, 83 L. Ed. 2d at 470 (citations omitted).

In conclusion, the United States Supreme Court held that based on all the problems arising from consideration of jury's inconsistent verdicts, "the best course to take is simply to insulate jury verdicts from review on this ground." *Id.* at 69, 83 L. Ed. 2d at 471.

In the case at hand, defendant Reid has argued that his conviction should be reversed because he was convicted of acting in concert with Adams on the assault conviction, but Adams was acquitted of the assault; thus, Reid's conviction is inconsistent with Adams' acquittal. Based on our previous decisions that it is not required that a principal be convicted in order for an aider and abettor to be convicted, and the United States Supreme Court's view on inconsistent verdicts, we conclude that defendant Reid's conviction should stand. We further conclude that the jury's verdict in this case may have been a demonstration of lenity for both Reid and Adams. It is possible that the jury properly reached the decision of defendant Reid's guilt on the basis that he was acting in concert with Adams but then, through mistake, compromise, or lenity, arrived at an inconsistent conclusion in its verdict against Adams. We note that if the jury did believe that Adams and Reid were acting in concert, then it could have also convicted Reid of the murder of Wilkes. The jury's decision to acquit Reid on this crime may have been a demonstration of compromise or lenity for Reid. A case such as this, where the evidence, even among the witnesses for each side, is contradictory and confusing, is a prime example of why we should not attempt to enter the jury's thought process to determine whether the jurors spoke their real conclusions in their conviction of Reid for assault, acquittal of Reid for murder, conviction of Adams for murder, or acquittal of Adams for assault. What we have done to protect defendant Reid from an irrational jury is determine if the evidence was sufficient to find defendant guilty of assault with a deadly weapon with intent to kill inflicting serious injury beyond a reasonable doubt. We have concluded that viewing the evidence in the light most favorable to the State, the jury could have determined that defendant Reid was acting in concert with defendant Adams and found him guilty under this theory. Reid's conviction will not be

reversed on the ground that there were inconsistent verdicts in his trial.

[4]   Defendant next argues that the trial court erroneously allowed Drakeford to testify to a statement made by Chris Roach. The State argues that the statement was admissible as an "excited utterance" exception to the hearsay rule and, in the alternative, that there was no error in allowing the evidence to come in because the statement was admitted without objection later in the trial.

We conclude, first, that the statement is not hearsay and thus was correctly admitted; second, even if the statement is hearsay, it was admissible under the hearsay exception as an "excited utterance"; and third, defendant cannot argue that any error resulted from the admission of the statement because the same statement later came into evidence through another witness without objection.

Defendant argues that Drakeford should not have been allowed to testify that Chris Roach yelled "shoot the mother f---er" just before defendants drew their guns because the statement was hearsay that did not fall under any exception. In this jurisdiction, " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). When evidence of a statement by someone other than the testifying witness is offered for a purpose other than to prove the truth of the matter asserted, the evidence is not hearsay. *State v. Coffey*, 326 N.C. 268, 282, 389 S.E.2d 48, 56 (1990). Statements of one person to another are not hearsay if the statement is made to explain the subsequent conduct of the person to whom the statement was made. *Id.; see also State v. Potter*, 295 N.C. 126, 132, 244 S.E.2d 397, 402 (1978) (decided prior to the enactment of the North Carolina Rules of Evidence, N.C.G.S. ch. 8C).

Drakeford's testimony that Chris Roach shouted "shoot the mother f---er" immediately before defendants pulled out their guns and began shooting was admitted to establish why defendants began shooting and to show the context in which the shooting began. The particular words that Roach said were not important to the case; what was important was that Roach made a statement and defendants responded. As such, the significance of the statement "lies solely in the fact that it was made," and the statement is not hearsay and is admissible. N.C.G.S. § 8C-1, Rule 801 official commentary (1992).

Assuming *arguendo*, however, that the statement is hearsay, the statement is admissible under N.C.G.S. § 8C-1, Rule 803(2). Rule 803(2), entitled "Excited Utterance," states that an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.C.G.S. § 8C-1, Rule 803(2) (1992). The reason for allowing this exception is that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces "spontaneous and sincere" utterances. 6 John H. Wigmore, *Evidence* § 1747(I) (James H. Chadbourn ed. 1976). "[T]he trustworthiness of this type of utterance lies in its spontaneity . . . ." 2 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 216 (4th ed. 1993). There is simply no time to "fabricate or contrive" statements spontaneously made during the excitement of an event. *Id.* For a statement to qualify as an "excited utterance," "there must be (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." *State v. Smith*, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985).

In *State v. Poole*, 298 N.C. 254, 258 S.E.2d 339 (1979), we concluded that a statement made as a person pulled a rifle out of his truck, before any violence actually started, was clearly admissible as a " 'spontaneous and instinctive declaration of the witness springing out of the transaction and relating to the contemporaneous acts' of the defendant." *Id.* at 258-59, 258 S.E.2d at 342 (quoting *State v. Bethea*, 186 N.C. 22, 25, 118 S.E. 800, 801 (1923) ). We have also held that a statement to a mother that her son was being arrested for manufacturing marijuana was a startling event triggering the excited utterance exception for the statement then made by the mother. *State v. Beaver*, 317 N.C. 643, 650, 346 S.E.2d 476, 480-81 (1986).

In this case, the statement was made by Chris Roach after someone with whom he had been arguing came toward him wielding a bar chair in the air. We hold that such an experience meets the requirement of a sufficiently startling event. Also, the statement was a spontaneous one, made in reaction to the threatening gestures; thus, there was no time to reflect or fabricate. We therefore conclude that the statement was admissible as an "excited utterance."

Furthermore, even if this statement is not admissible under the excited utterance exception, we hold that there is still no error

in admitting the statement into evidence, as the statement was admitted without objection during the testimony of the next witness, Mr. Dockery. "It is a well-settled rule that 'if a party objects to the admission of certain evidence and the same or like evidence is later admitted without objection, the party has waived the objection to the earlier evidence.'" *State v. Wingard*, 317 N.C. 590, 599, 346 S.E.2d 638, 644 (1986) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 30 (1982)). Therefore, witness Dockery's testimony, without objection, as to what Chris Roach said just before the shooting operated as a waiver of defendant's objection to Drakeford's testimony.

[5] Defendant Reid's final contention of error is that the statements that he made to Officer Mangum after his arrest should not have been admitted at trial. We conclude that the trial judge's finding that defendant waived his rights understandingly, knowingly, and willingly is supported by competent evidence; thus, it was not error to admit the statement into evidence at trial.

It is well settled that a defendant may waive his *Miranda* rights, but the State bears the burden of proving that a defendant made a knowing and intelligent waiver. *State v. Simpson*, 314 N.C. 359, 367, 334 S.E.2d 53, 59 (1985). "Whether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused." *Id.* The totality of the circumstances must be carefully scrutinized when determining if a youthful defendant has legitimately waived his *Miranda* rights. *State v. Fincher*, 309 N.C. 1, 19, 305 S.E.2d 685, 697 (1983).

The trial judge stated his conclusions in part as follows:

That on January 9, 1992, after the incident at the Casanova Club in which Delancey Bernard Wilkes was killed and Antwane Drakeford was injured, the defendant Derek Reid was taken to the Law Enforcement Center. That while at the Law Enforcement Center he was allowed to sleep and did sleep for a considerable period of time. That he was brought breakfast from McDonald's and was allowed additional sleep. That he was allowed to go to the restroom when he requested.

That there is no evidence that he was coerced or otherwise abused at the Law Enforcement Center. . . .

That on or about 1:30 the chief investigating officer M.A. Mangum commenced reading Derek Reid the Juvenile Waiver of Rights form, included in State's Exhibit 1-M. That each of the rights were read to the defendant and that he acknowledged receiving such rights by his signature. That in addition he was allowed to read such rights and affix his signature to the Juvenile Waiver of Rights form incorporated by reference herein.

. . . .

[That Officer Mangum obtained a complete statement from Derek Reid] and that the first page of the statement was completed at 2:55 p.m., January 9, 1992. That the statement was completed on or about 5:00 p.m. that same date, and that the defendant was given an opportunity to read the statement. That he did, in fact, read the statement and had it in his possession approximately 30 minutes, and that on or about 5:30 p.m. he signed each page of the statement indicating that he had read the statement.

That Officer Mangum did not hear the defendant Reid at any time request to call his mother or use a telephone.

. . . .

Based on the foregoing findings of fact, all found by at least a preponderance of the evidence, and by the Court's consideration of the totality of the circumstances, the Court concludes as a matter of law that none of the constitutional rights of the defendant were violated in connection with his detention, interrogation or statements. . . .

That the statement made by the defendant was freely, voluntarily, and understandably made, and that at all times in question the defendant was in full understanding of his constitutional rights concerning the right to remain silent, the right to counsel, and all other rights. And that he freely, knowingly, and intelligently and voluntarily waived each of these rights and thereafter made the statements in question.

"While the trial court's findings of fact are binding on this Court if supported by the evidence, the conclusions are questions of law which are fully reviewable by this Court on appeal." *State v. Barber*, 335 N.C. 120, 129, 436 S.E.2d 106, 111 (1993) (statement

STATE v. REID

[335 N.C. 647 (1994)]

of juvenile at issue). In *State v. McClintick*, 315 N.C. 649, 340 S.E.2d 41 (1986), a seventeen-year-old was tried for the crimes of rape, robbery, kidnapping, and burglary. In a suppression hearing about the admissibility of statements made by defendant to officers, defendant testified that he had asked to see his grandparents, had requested a lawyer, and was never advised of his rights. *Id.* at 654, 340 S.E.2d at 44. The trial court found that defendant had voluntarily and understandingly waived his rights and admitted the juvenile rights waiver form and statements made by the juvenile after he signed the form. After close examination of the entire record, we concluded that no prejudicial error occurred at the trial.

In this case, we conclude that there was ample evidence to support the findings of fact, and those facts support the conclusions of law that defendant voluntarily waived his juvenile and *Miranda* rights and that the statement that he gave thereafter was freely, voluntarily, and understandingly given. These conclusions support the trial judge's order that the statement given by defendant to Officer Mangum was admissible in this case.

For the reasons stated above, we conclude that defendant Reid received a fair trial free of prejudicial error.

[6] We move now to the issues presented by defendant Adams. Adams first argues that the evidence was insufficient to support a conviction of first-degree murder. Applying the same standard of review set out above, we hold that the evidence taken in the light most favorable to the State does support a conviction of first-degree murder.

Defendant Adams was convicted of first-degree murder under the theory of premeditation and deliberation. "Premeditation means that the defendant thought about killing the victim for some period of time, however short, before the killing. Deliberation means the execution of an intent to kill in a cool state of blood without legal provocation and in furtherance of a fixed design; it does not require reflection for any appreciable length of time." *State v. Bray*, 321 N.C. 663, 671, 365 S.E.2d 571, 576 (1988) (citations omitted). "A specific intent to kill is a necessary constituent of the elements of premeditation and deliberation, and therefore, proof of premeditation and deliberation is also proof of intent to kill." *State v. Thomas*, 332 N.C. 544, 560, 423 S.E.2d 75, 84 (1992).

STATE v. REID

[335 N.C. 647 (1994)]

"An unlawful killing is deliberated and premeditated if done as part of a fixed design to kill, notwithstanding the fact that the defendant was angry or emotional at the time, unless such anger or emotion was strong enough to disturb the defendant's ability to reason." *Id.* The requirement of a cool state of blood does not require that the defendant be calm or tranquil. The phrase cool state of blood means that the defendant's anger or emotion must not have been such as to overcome the defendant's reason. *Id.* at 560-61, 423 S.E.2d at 84.

Defendant Adams argues that the State presented no evidence that defendant killed the victim after premeditation and deliberation. "Defendant correctly notes that in order to convict him of premeditated and deliberate murder, the jury must have found beyond a reasonable doubt that defendant not only intended the killing, but formed that intent after premeditation and deliberation." *State v. Zuniga*, 320 N.C. 233, 258, 357 S.E.2d 898, 914, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987).

In *State v. Meyers*, 309 N.C. 78, 305 S.E.2d 506 (1983), we concluded that circumstantial evidence may be used to infer premeditation and deliberation and that certain circumstances may be considered as tending to show premeditation and deliberation. These circumstances include: "(1) the want of provocation on the part of the victim, (2) the defendant's conduct and statements before and after the killing, (3) threats made against the victim by the defendant, (4) ill will or previous difficulty between the parties, (5) evidence that the killing was done in a brutal manner." *Id.* at 84, 305 S.E.2d at 510.

We conclude that there was substantial evidence that the killing here was premeditated and deliberated. The evidence showed that Roach, Reid, Adams, White, and Moore went to the club together; the victim and Chris Roach got into an argument over a girl; after the argument, defendants Reid and Adams left the club, returning a few minutes later. In the past, defendant was known to have put a .357 Magnum in his car in the parking lot of the Casanova Club. Defendants, Chris Roach, and some other men approached Antwane Drakeford and the decedent. The victim picked up a chair and swung it at Roach, who yelled, "shoot the mother f---er." Adams pulled out a gun and began firing. At the time Adams fired his gun, he was holding his arm straight out and pointing it into the crowd where the decedent was standing.

The gun that fired the bullet which killed the victim was identified as the gun being held by defendant on the night of the murder. Taken in the light most favorable to the State, this evidence was clearly sufficient to support a finding of premeditation and deliberation.

[7] Defendant next argues that the trial court erred when it instructed the jury that it could infer premeditation and deliberation from lack of provocation by the "defendant" (rather than by the "victim"). Defendant failed to object to the court's instructions at trial; thus, we review defendant's assignment of error under the plain error rule. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1992). "A mere slip of the tongue which is not called to the attention of the court at the time it is made will not constitute prejudicial error when it is apparent from a contextual reading of the charge that the jury could not have been misled thereby." *State v. Silhan*, 302 N.C. 223, 257, 275 S.E.2d 450, 475 (1981). Additionally, we have concluded that when a trial judge makes an improper instruction earlier in the charge and then corrects it, the error is "completely lacking in prejudicial effect." *State v. Wells*, 290 N.C. 485, 498, 226 S.E.2d 325, 334 (1976); *see also State v. Swift*, 290 N.C. 383, 405, 226 S.E.2d 652, 668 (1976) (judge's error in instruction that is later corrected is simply a *"lapsus linguae"* that "resulted in no prejudice to defendant"). In *Silhan*, *Swift*, and *Wells*, as here, the judge made a mistake while instructing the jury. We conclude that viewing the jury instructions as a whole, the jury would not have been misled and confused by the *lapsus linguae* of the judge in this case.

In the case *sub judice*, the trial court's instructions as a whole indicate that provocation on the part of the "victim," not the defendant, is the relevant inquiry. The trial court instructed that the burden was on the State to show that defendant acted intentionally, with malice and premeditation. Additionally, the court instructed on voluntary manslaughter, which clearly indicated that provocation on the part of the "victim" is what is at issue. Finally, the trial court corrected its mistake when it gave the same instruction to the jury for defendant Reid. The trial court had instructed the jury at the beginning of the instructions that "basically, I'm going

to read the instructions twice. . . . I want you to know that if the first time I read it over to you it's confusing, I'll be reading it over to you again." The trial court correctly instructed the jury the second time through. We conclude that the *lapsus linguae* simply had no discernable prejudicial effect and will not be held to be plain error.

[8]  Defendant Adams also argues that this instruction was erroneous, as all the evidence indicated that the victim did provoke Adams. We conclude that there was evidence presented that Wilkes did not provoke defendant Adams. There was evidence presented that it was Drakeford, not Wilkes, who was wielding the chair, and there was also evidence presented that the chair was being thrown towards Roach, not Adams. Finally, there was evidence that Adams approached the victims and initiated the fight and that the victims were sitting down talking when defendant's group approached them. We conclude that the evidence supported the instruction on lack of provocation by the victim.

[9]  We also do not believe, as alleged by defendant Adams, that the trial court's instructions confused the jury on the distinction between "ordinary provocation" and "legal provocation." Defendant argues that the trial judge only instructed the jury on the definition of legal provocation such as to reduce first-degree murder to voluntary manslaughter. Defendant argues that the trial judge did not define "ordinary provocation," which would reduce first-degree murder to second-degree murder. Thus, when the jurors were instructed that premeditation and deliberation may be proven by "lack of provocation," they would have thought that they must find legal provocation to negate premeditation and deliberation.

Defendant argues that it was more likely that the jury was confused because of an additional error the trial court made during instructions. In instructing as to Adams, for first-degree murder, the trial court varied from the pattern jury instruction, stating:

> If the intent to kill was formed with a fixed purpose, not *only* under the influence of some suddenly aroused violent passion, it is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect.

(Emphasis added.) Defendant alleges that by inserting the word "only," the trial court reinforced the notion that deliberation is

STATE v. REID

[335 N.C. 647 (1994)]

only negated if the defendant is completely overtaken with passion and thus has a heat-of-passion defense.

We note that the trial court corrected its instruction when instructing the jury as to defendant Reid and that no objection was made to the instruction at trial; thus, the inclusion of the word "only" in the first instance could not have been prejudicial error. Additionally, we have recently held against the defendant on the issue of jury confusion, concluding that the pattern jury instructions (which the trial court used here, with the exception of the inclusion of the word "only" when instructing as to Adams) do not confuse juries about the two types of provocation. In *State v. Handy*, 331 N.C. 515, 419 S.E.2d 545 (1992), the defendant alleged that an instruction on premeditation and deliberation, "coupled with the trial court's subsequent charge on voluntary manslaughter and the definition of 'legal' or 'adequate' provocation, which is sufficient to reduce murder to manslaughter, may have misled the jurors to believe that a killing committed without 'legal' or 'adequate' provocation constitutes first-degree murder committed with premeditation and deliberation." *Id.* at 525, 419 S.E.2d at 550. We concluded that this was not a correct interpretation of the instructions.

In *Handy*, we found that the jury had been correctly instructed that in order to find the defendant guilty of first-degree murder, it must find that the State had proven beyond a reasonable doubt that defendant acted with premeditation and deliberation. In *Handy*, as here, the trial court gave definitions of the theories of premeditation, deliberation, and intent to kill. The jury was charged that defendant would not be guilty of first-degree murder if he formed the intent to kill under the influence of some suddenly aroused violent passion. *Id.* at 527, 419 S.E.2d at 551.

In *Handy*, we held that the instructions would not have "caused the jurors to conclude that defendant acted with premeditation or deliberation merely because the evidence showed that defendant did not act in a heat of passion following adequate provocation the proof of which reduces the degree of homicide to voluntary manslaughter." *Id.* We reaffirm our holding in *Handy* and conclude that the jury would not have been confused by the instructions at issue here and that there was no prejudicial error to defendant Adams.

[10]  Next, defendant argues that North Carolina's law on imperfect and perfect self-defense is internally inconsistent. Defendant argues that to prove imperfect self-defense, a defendant should only have to show that defendant had an honest belief in the need to use deadly force. Defendant also argues that the trial judge did not clearly set out the difference between perfect and imperfect self-defense. We conclude that defendant was not entitled to any instruction on self-defense and that any instruction on self-defense that was given was error favorable to defendant.

The principles regarding the law of self-defense are well established. The elements that constitute perfect self-defense are:

> (1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

> (3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

> (4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. McAvoy*, 331 N.C. 583, 595, 417 S.E.2d 489, 497 (1992).

Under the law of perfect self-defense, a defendant is altogether excused if all of the above four elements existed at the time of the killing. Under the law of imperfect self-defense, "if the first two elements existed at the time of the killing, but defendant, although without murderous intent, was the aggressor in bringing on the affray or used excessive force, defendant is guilty at least of voluntary manslaughter." *Id.* at 596, 417 S.E.2d at 497.

> [B]efore the defendant is entitled to an instruction on self-defense, two questions must be answered in the affirmative: (1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable? If both queries are answered in the

affirmative, then an instruction on self-defense must be given. If, however, the evidence requires a negative response to either question, a self-defense instruction should not be given.

*State v. Bush*, 307 N.C. 152, 160-61, 297 S.E.2d 563, 569 (1982). If there is no evidence from which a jury could reasonably find that defendant, in fact, believed it to be necessary to kill his adversary to protect himself from death or great bodily harm, defendant is not entitled to have the jury instructed on self-defense. *Id.* at 161, 297 S.E.2d at 569.

We hold that defendant has presented no evidence that he believed it was necessary to kill the deceased in order to save himself from death or great bodily harm; thus, defendant was not entitled to any self-defense instructions. Defendant said he had no fear of death and that he never shot at Wilkes or went near Wilkes. In fact, although Adams testified extensively, he never stated that he feared for his life, instead stating that he simply shot at the ground, never going near Wilkes or aiming at anyone in particular when he shot his gun. If what defendant contended was true, that he never aimed his gun at anyone, then "the first requirement of self-defense, that defendant believed it necessary to kill the victim[,] would not be met." *State v. Mize*, 316 N.C. 48, 54, 340 S.E.2d 439, 443 (1981); *see also State v. Wallace*, 309 N.C. 141, 148-49, 305 S.E.2d 548, 553 (1983) (evidence would not support a finding of not guilty by reason of self-defense or a verdict of guilty of voluntary manslaughter where defendant's evidence indicated that he did not shoot the deceased intentionally and the State's evidence if believed clearly supports nothing less than a verdict of murder in the second degree). Defendant's whole case is based on the theory that he shot at the floor when the fight began and that if he did shoot Wilkes, it was by accident. Defendant never states that he was in fear of his life because of Wilkes' actions. Nor was any other evidence presented that defendant shot at Wilkes because he feared for his life. In fact, defendant argued that he was not even holding the weapon that killed Wilkes. Seemingly, it never appeared to defendant and he never "believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm." *McAvoy*, 331 N.C. at 595, 417 S.E.2d at 497. Thus, he cannot argue that he was acting in self-defense because he feared he was going to be killed or suffer great bodily harm. Defendant's own testimony, taken in the light most favorable to him, shows that he had some vague and unspecified nervousness

or fear due to the fighting that was going on around him but does not state that he specifically feared the decedent; this is not enough to justify an instruction on self-defense. *Bush*, 307 N.C. at 159, 297 S.E.2d at 568.

In *State v. Rawley*, 237 N.C. 233, 74 S.E.2d 620 (1953), we concluded that where a defendant testifies "(1) that, at the time, she did not think she was in great enough danger to make it necessary for her to cut deceased; (2) that not only [did] she . . . not cut [the deceased] in self-defense, but [she] did not cut him at all; and (3) that she claims he was cut accidentally," then the idea that defendant believed she was in danger of losing her life or suffering great bodily harm is refuted. Hence, the principle of self-defense should not be considered. *Id.* at 237, 74 S.E.2d at 623.

When a trial court undertakes to instruct the jury on self-defense in a case in which no instruction in this regard is required, the gratuitous instructions on self-defense are error favorable to defendant. As defendant was not entitled to any jury instructions on self-defense, any mistakes by the trial court in its instructions on self-defense were, at worst, harmless error not necessitating a new trial. *Bush*, 307 N.C. at 161, 221 S.E.2d at 569.

[11] Finally, defendant argues that the trial court erroneously instructed the jury on the first-aggressor theory of imperfect self-defense, arguing that there was no evidence to support the instruction. As noted above, defendant never presented any evidence that he acted under a reasonable belief that it was necessary to kill in order to save himself from death or great bodily harm. This is the first requirement to establish any type of self-defense, perfect or imperfect. As defendant could not meet this requirement, he was not entitled to any instruction on self-defense, perfect or imperfect. We conclude that any mistake made by the trial court in its instruction on imperfect self-defense was at worst harmless error.

This conclusion is further supported by the fact that defendant was convicted of murder in the first degree. The first-aggressor instruction is relevant to the finding of voluntary manslaughter. *Potter*, 295 N.C. at 144, 244 S.E.2d at 408. The jury would consider whether defendant was the aggressor if it first found that defendant killed because he believed it necessary to kill in order to save himself and that defendant's belief was reasonable. In finding de-

**STATE v. REID**

[335 N.C. 647 (1994)]

fendant guilty of first-degree murder, the jury must have found that defendant acted without just cause or excuse and with malice, specifically intending to kill the deceased after premeditation and with deliberation. *Id.* at 145, 244 S.E.2d at 409.

Thus, by finding both that the killing was without just cause or excuse and with malice, the jury must have found either that defendant did not believe it was necessary to kill Bernard Wilkes in order to save himself from death or great bodily harm or that, if he did, such a belief was not reasonable under the circumstances. Having so found, the jury never reached the question whether defendant was the aggressor in bringing on the affray; or, if the jury did reach it, the answer became immaterial. Any error in the instruction on the first-aggressor theory must have been harmless. *Id.* at 144, 244 S.E.2d at 409.

We conclude that no prejudicial error resulted from the giving of the instructions at issue here.

For the reasons stated above, we conclude that defendant Adams received a fair trial free of prejudicial error.

In conclusion, having carefully reviewed the record and each of defendants' assignments of error, we hold that defendants received a fair trial, free of prejudicial error. Accordingly, we leave undisturbed defendant Reid's conviction of assault with a deadly weapon with intent to kill inflicting serious injury and defendant Adams' conviction of first-degree murder.

NO ERROR.