BRYANT, Judge.
 

 *446
 
 Where the totality of the circumstances shows that the juvenile defendant did not knowingly, willingly, and understandingly waive his rights pursuant to the State and federal constitutions or N.C. Gen. Stat. § 7B-2101(d), the trial court erred in denying defendant's motion to suppress his statement made to an interrogating officer, and we reverse, vacate, and remand.
 

 Juvenile defendant Felix Ricardo Saldierna was arrested on 9 January 2013 at his home in South Carolina in connection with incidents involving
 
 *447
 
 several homes around Charlotte that had been broken into on 17 and 18 December 2012.
 
 [1]
 
 Before questioning, the detective read defendant his rights and asked whether he understood them. Defendant ultimately signed a Juvenile Waiver of Rights form, of which defendant had been given two copies-one in English and one in Spanish. After initialing and signing the English language form, Felix, who was sixteen years old at the time, asked to call his mother before undergoing custodial questioning by Detective Kelly of the Charlotte-Mecklenburg Police Department. The call was allowed, but defendant could not reach his mother. The custodial interrogation then began. Over the course of the interrogation, defendant confessed his involvement in the incidents in Charlotte on 17 and 18 December 2012.
 

 On 22 January 2013,
 

 [d]efendant was indicted ... for two counts of felony breaking and entering, conspiracy to commit breaking and entering, and conspiracy to commit common law larceny after breaking and entering. On 9 October 2013, defendant moved to suppress his confession, arguing that it was illegally obtained in violation both of his rights as a juvenile under N.C.G.S. § 7B-2101 and of his rights under the United States Constitution. After conducting an evidentiary hearing, the trial court denied the motion in an order entered on 20 February 2014, finding as facts that defendant was advised of his juvenile rights and, after receiving forms setting out these rights both in English and Spanish and having the rights read to him in English by [Detective] Kelly, indicated that he understood them. In addition, the trial court found that defendant informed [Detective] Kelly that he wished to waive his juvenile
 
 *35
 
 rights and signed the form memorializing that wish.
 

 ....
 

 On 4 June 2014, defendant entered pleas of guilty to two counts of felony breaking and entering and two counts of conspiracy to commit breaking and entering, while reserving his right to appeal from the denial of his motion to suppress. The court sentenced defendant to a
 
 *448
 
 term of six to seventeen months, suspended for thirty-six months subject to supervised probation.
 

 The Court of Appeals reversed the trial court's order denying defendant's motion to suppress, vacated the judgments entered upon defendant's guilty pleas, and remanded the case to the trial court for further proceedings. The Court of Appeals recognized that the trial court correctly found that defendant's statement asking to telephone his mother was ambiguous at best.... [but it] held that when a juvenile between the ages of fourteen and eighteen makes an ambiguous statement that potentially pertains to the right to have a parent present, an interviewing officer must clarify the juvenile's meaning before proceeding with questioning.
 

 Saldierna
 
 , 369 N.C. at ----, 794 S.E.2d at 476-77 (footnote omitted) (citations omitted). The Supreme Court of North Carolina granted the State's petition for discretionary review.
 
 Id.
 
 at ----, 794 S.E.2d at 477.
 

 In reviewing this Court's opinion in
 
 Saldierna
 
 , the Supreme Court reasoned that "[a]lthough defendant asked to call his mother, he never gave any indication that he wanted to have her present for his interrogation, nor did he condition his interview on first speaking with her."
 
 Id.
 
 at ----, 794 S.E.2d at 479. As a result, the Supreme Court reversed the decision of the Court of Appeals "[b]ecause defendant's juvenile statutory rights were not violated[.]"
 
 Id.
 
 However, in doing so, the Supreme Court noted that "[e]ven though we have determined that defendant's N.C.G.S. § 7B-2101(a)(3) right [ (to have a parent present during questioning) ] was not violated, defendant's confession is not admissible unless he knowingly, willingly, and understandingly waived his rights."
 
 Id.
 
 (citing N.C.G.S. § 7B-2101(d) ). Thus, the case was remanded to this Court "for consideration of the validity of defendant's waiver of his statutory and constitutional rights."
 
 Id.
 

 _________________________
 

 As the Supreme Court of North Carolina has determined that defendant's N.C.G.S. § 7B-2101(a)(3) right was not violated as "defendant's request to call his mother was not a clear invocation of his right to consult a parent or guardian before proceeding with the questioning[,]"
 
 Saldierna
 
 , --- N.C. at ----, 794 S.E.2d at 475, the question before us now on remand is whether defendant knowingly, willingly, and understandingly waived his rights under section 7B-2101 of the North Carolina General Statutes and under the constitutions of North Carolina and the
 
 *449
 
 United States, so as to make his confession admissible. We conclude that he did not.
 

 "The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law."
 
 State v. Biber
 
 ,
 
 365 N.C. 162
 
 , 167-68,
 
 712 S.E.2d 874
 
 , 878 (2011) (citing
 
 State v. Brooks
 
 ,
 
 337 N.C. 132
 
 , 140-41,
 
 446 S.E.2d 579
 
 , 585 (1994) ). Findings of fact [as to whether a waiver of rights was made knowingly, willingly, and understandingly] are binding on appeal if [they are] supported by competent evidence,
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 619 (1982) (citations omitted), while conclusions of law [regarding whether a waiver of rights was valid and a subsequent confession voluntary,] are reviewed de novo,
 
 State v. Ortiz-Zape
 
 ,
 
 367 N.C. 1
 
 , 5,
 
 743 S.E.2d 156
 
 , 159 (2013) (citing
 
 Biber
 
 ,
 
 365 N.C. at 168
 
 ,
 
 712 S.E.2d at
 
 878 ),
 
 cert. denied
 
 , --- U.S. ----,
 
 134 S.Ct. 2660
 
 ,
 
 189 L.Ed.2d 208
 
 (2014).
 

 Id.
 

 at ----, 794 S.E.2d at 477.
 

 "In order to protect the Fifth Amendment right against compelled self-incrimination, suspects, including juveniles, are entitled to the warnings set forth in
 
 Miranda v. Arizona
 
 , prior to police questioning."
 
 In re K.D.L.
 
 ,
 
 207 N.C.App. 453
 
 , 457,
 
 700 S.E.2d 766
 
 , 770 (2010) (citing
 
 *36
 

 384 U.S. 436
 
 , 478-79,
 
 86 S.Ct. 1602
 
 , 1630-1631,
 
 16 L.Ed.2d 694
 
 , 726 (1966) ). Thus,
 

 [t]he North Carolina Juvenile Code provides additional protection for juveniles. Juveniles who are "in custody" must be advised of the following before questioning begins:
 

 (1) That the juvenile has the right to remain silent;
 

 (2) That any statement the juvenile does make can be and may be used against the juvenile;
 

 (3) That the juvenile has a right to have a parent, guardian, or custodian present during questioning; and
 

 (4) That the juvenile has a right to consult with an attorney and that one will be appointed for the juvenile if the juvenile is not represented and wants representation.
 

 *450
 

 Id.
 

 at 457-58
 
 ,
 
 700 S.E.2d at 770
 
 (quoting N.C. Gen. Stat. § 7B-2101(a)(1)-(4) (2009) ). "Previous decisions by our appellate division indicate the general
 
 Miranda
 
 custodial interrogation framework is applicable to section 7B-2101."
 
 Id.
 
 at 458,
 
 700 S.E.2d at
 
 770 (citing
 
 In re W.R.
 
 ,
 
 363 N.C. 244
 
 , 247,
 
 675 S.E.2d 342
 
 , 344 (2009) );
 
 see
 

 id.
 

 at 459
 
 ,
 
 700 S.E.2d at 771
 
 ("[W]e cannot forget that police interrogation is inherently coercive-particularly for young people." (citations omitted)).
 

 "Before admitting into evidence any statement resulting from custodial interrogation,
 
 [
 

 2
 

 ]
 
 the court shall find that the juvenile knowingly, willingly, and understandingly waived the juvenile's rights." N.C. Gen. Stat. § 7B-2101(d) (2015) ;
 
 State v. Oglesby
 
 ,
 
 361 N.C. 550
 
 , 555,
 
 648 S.E.2d 819
 
 , 822 (2007) ("Before allowing evidence to be admitted from a juvenile's custodial interrogation, a trial court is required to 'find that the juvenile knowingly, willingly, and understandingly waived the juvenile's rights.' " (quoting N.C.G.S. § 7B-2101(d) )).
 
 [3]
 

 "Whether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused."
 
 State v. Simpson
 
 ,
 
 314 N.C. 359
 
 , 367,
 
 334 S.E.2d 53
 
 , 59 (1985) (citations omitted). "When determining the voluntariness of a confession, we examine the 'totality of the circumstances surrounding the confession.' "
 
 State v. Hicks
 
 ,
 
 333 N.C. 467
 
 , 482,
 
 428 S.E.2d 167
 
 , 176 (1993) (quoting
 
 State v. Barlow
 
 ,
 
 330 N.C. 133
 
 , 140-41,
 
 409 S.E.2d 906
 
 , 911 (1991) ),
 
 abrogated by
 

 State v. Buchanan
 
 ,
 
 353 N.C. 332
 
 ,
 
 543 S.E.2d 823
 
 (2001). Furthermore, "an express
 
 written
 
 waiver, while strong proof of the validity of the waiver, is not inevitably sufficient to establish a
 
 valid
 
 waiver."
 
 Simpson
 
 ,
 
 314 N.C. at 367
 
 ,
 
 334 S.E.2d at 59
 
 (emphasis added) (citation omitted).
 

 "The State must show by a preponderance of the evidence that the defendant made a knowing and intelligent waiver of his rights and that his statement was voluntary."
 
 State v. Flowers
 
 ,
 
 128 N.C.App. 697
 
 , 701,
 
 497 S.E.2d 94
 
 , 97 (1998) (citing
 
 *451
 

 State v. Thibodeaux
 
 ,
 
 341 N.C. 53
 
 , 58,
 
 459 S.E.2d 501
 
 , 505 (1995) ). Indeed, "the burden upon the State to ensure a juvenile's rights are protected is greater than in the criminal prosecution of an adult."
 
 In re M.L.T.H.
 
 ,
 
 200 N.C.App. 476
 
 , 489,
 
 685 S.E.2d 117
 
 , 126 (2009) (citing
 
 In re T.E.F.
 
 ,
 
 359 N.C. 570
 
 , 575,
 
 614 S.E.2d 296
 
 , 299 (2005) );
 
 see also
 

 Simpson
 
 ,
 
 314 N.C. at 367
 
 ,
 
 334 S.E.2d at 59
 
 ("The prosecution bears the burden of demonstrating that the waiver was knowingly and intelligently made[.]" (citation omitted)).
 

 Here, in denying defendant's motion to suppress his confession, the trial court found and concluded in relevant part as follows
 
 *37
 
 regarding defendant's waiver of his juvenile rights:
 

 FINDINGS OF FACT
 

 1. That Defendant was in custody.
 

 2. That Defendant was advised of his juvenile rights pursuant to North Carolina General Statute § 7B-2101.
 

 3. That Detective Kelly of the Charlotte-Mecklenburg Police Department advised Defendant of his juvenile rights.
 

 4. That Defendant was advised of his juvenile rights in three manners. Defendant was advised of his juvenile rights in spoken English, in written English, and in written Spanish.
 

 5. That Defendant indicated that he understood his juvenile rights as given to him by Detective Kelly.
 

 6. That Defendant indicated he understood his rights after being given and reviewing a form enumerating those rights in Spanish.
 

 7. That Defendant indicated he understood that he had the right to remain silent. Defendant understood that to mean that he did not have to say anything or answer any questions. Defendant initialed next to this right at number 1 on the English rights form provided to him by Detective Kelly to signify his understanding.
 

 8. That Defendant indicated he understood that anything he said could be used against him. Defendant initialed next to this right at number 2 on the English rights form provided to him by Detective Kelly to signify his understanding.
 

 *452
 
 9. That Defendant indicated he understood that he had the right to have a parent, guardian, or custodian there with him during questioning. Defendant understood the word parent meant his mother, father, stepmother, or stepfather. Defendant understood the word guardian meant the person responsible for taking care of him. Defendant understood the word custodian meant the person in charge of him where he was living. Defendant initialed next to this right at number 3 on the English rights form provided to him by Detective Kelly to signify his understanding.
 

 10. That Defendant indicated he understood that he had the right to have a lawyer and that he had the right to have a lawyer there with him at the time to advise and help him during questioning. Defendant initialed next to this right at number 4 on the English rights form provided to him by Detective Kelly to signify his understanding.
 

 11. That Defendant indicated he understood that if he wanted a lawyer there with him during questioning, a lawyer would be provided to him at no cost prior to questioning. Defendant initialed next to this right at number 5 on the English rights form provided to him by Detective Kelly to signify his understanding.
 

 12. That Defendant initialed a space below the enumerated rights on the English rights form then stated the following: "I am 14 years old or more and I understand my rights as explained by Detective Kelly. I DO with [sic] to answer questions now, WITHOUT a lawyer, parent, guardian, or custodian here with me. My decision to answer questions now is made freely and is my own choice. No one has threatened me in any way or promised me special treatment. Because I have decided to answer questions now, I am signing my name below."
 

 13. That Defendant's signature appears on the English rights form below the initialed portions of the form. Defendant's signature appears next to the date, 1-9-13, and the time, 12:10. Detective Kelly signed her name as a witness below Defendant's signature.
 

 *453
 
 14. That after being informed of his rights, informing Detective Kelly he wished to waive those rights, and signing the rights form, Defendant communicated to Detective Kelly that he wished to contact his mother by phone....
 

 *38
 
 ....
 

 CONCLUSIONS OF LAW
 

 1. That the State carried its burden by a preponderance of the evidence that Defendant knowingly, willingly, and understandingly waived his juvenile rights.
 

 2. That the interview process in this case was consistent with the interrogation procedures as set forth in North Carolina General Statute § 7B-2101.
 

 3. That none of Defendant's State or Federal rights were violated during the interview conducted of Defendant.
 

 4. That statements made by Defendant were not gathered as a result of any State or Federal rights violation.
 
 [
 

 4
 

 ]
 

 In the instant case, defendant was sixteen years of age at the time he was interviewed by Detective Kelly and had only obtained an eighth
 
 *454
 
 grade education. Defendant indicated Spanish was his primary language. He stated he could write in English, but that he had difficulty reading English and difficulty in understanding English as spoken. The interrogation took place in the booking area of the Justice Center, and defendant was at all times in the presence of three law enforcement officers.
 
 [5]
 
 The transcript of the audio recording of Detective Kelly's conversation with defendant in which defendant was said to have "knowingly, willingly, and understandingly" waived his rights and agreed to speak with the detective reads, in full, as follows:
 

 K: You understand I'm a police officer, right?
 

 F: Yes maam.
 

 K: Ok, and that I would like to talk to you about this. And this officer has also explained to me and I understand that I have the right to remain silent, that means that I don't have to say anything or answer any questions. Should be right there number 1 right on there. Do you understand that?
 

 F:
 
 [unintelligible] questions?
 

 K: Yes, that is your right? So do you understand that? If you understand that, put your initials right there showing that you understand that. On this sheet. On this one. You can put it on both. Anything I say can be used against me. Do you understand that?
 

 F: Yes maam.
 

 K: I have the right to have a parent guardian or custodian here with me now during questioning. Parent means my mother, father, stepmother, or stepfather. Guardian means the person responsible for taking care of me. Custodian means the person in charge of me where I am living. Do you understand that? Do you want to read that?
 

 F: Yeah.
 
 [
 

 6
 

 ]
 

 *39
 
 K: Do you understand that?
 

 *455
 
 F:
 
 [no response]
 

 K: I have the right to talk to a lawyer and to have a lawyer here with me now to advise and help during questioning. Do you understand that?
 

 F:
 
 [unintelligible]
 

 K: If I want to have a lawyer with me during questioning one will be provided to me at no cost before any questioning. Do you understand that?
 

 F: Yes maam.
 

 K: Ok. Now I want to talk to you about some stuff that's happened in Charlotte. And um, I will tell you this. There's been some friends of yours that have already been questioned about these items and these issues. And they've been locked up. And that's what I want to talk to you about. Do you want to help me out and help me understand what's been going on with some of these cases and talk to me about this now here?
 

 F: Uh
 

 K: Are you willing to talk to me is what I'm asking.
 

 F: Yes maam.
 

 K: Ok. So I am 14 years or more. Let me see that pen. And I understand my rights as they've been explained by [D]etective Kelly. I do wish to answer questions now without a lawyer, parent, guardian or custodian here with me? My decision to answer questions now is made freely and is my own choice. No one has threatened me in any way or has promised me any special treatment because I have decided to answer questions now. I am signing my name below. Do you understand this? Initial, sign, date and time.
 
 [
 

 7
 

 ]
 

 [noise]
 

 K:
 
 it is 1/9/13. It is 12:10PM. [unintelligible background talking among officers]
 

 F:
 
 Um, Can I call my mom?
 

 K:
 
 Call your mom now?
 

 *456
 
 F:
 
 She's on her um. I think she is on her lunch now.
 

 K:
 
 You want to call her now before we talk?
 

 K [to other officers]:
 
 He wants to call his mom.
 

 F:
 
 Cause she's on, I think she's on her lunch.
 

 Other officer:
 
 [unintelligible] He left her a message on her phone.
 

 F:
 
 But she doesn't speak English.
 

 [conversation among officers]
 

 K: I have mine. Can he dial it from a landline you think?
 

 [more unintelligible conversation among officers]
 

 [other officer]: step back outside and we'll let you call your mom outside. [unintelligible]. You're going to have to talk to her. Neither one of us speak Spanish, ok.
 

 [more unintelligible conversation among officers].
 

 9:50: [[defendant] can be heard on phone. Call is not intelligible.]
 

 10:40 F [Phone can be heard making a phone call in Spanish]
 

 [Sound of door closing].
 

 K: 12:20: Alright Felix, so, let's talk about this thing going on. Like I said a lot of your friends have been locked up and everybody's talking. They're telling me about what's going on and what you've been up to. I'm not saying you're the ringleader of this here thing and some kind of mastermind right but I think you've gone along with these guys and gotten yourself into a little bit of trouble here. This is not something that's going to end your life. You know what I'm saying. This is not a huge deal. I know you guys were going into houses when nobody was home. You weren't looking to hurt anybody or anything like that. I just want to hear your side of the story. We can start off. I'm going to ask you questions I know the answer to. A lot of these questions are to tell if you're being truthful to me ...
 

 (emphasis added).
 

 *457
 
 While our Supreme Court has held that defendant's question "Um, Can I call my mom?" was not sufficient to clearly invoke his statutory right to have his mother present,
 
 *40
 

 see
 

 Saldierna
 
 , --- N.C. at ----, 794 S.E.2d at 475, this transcript nevertheless contains several "[unintelligible]" remarks or non-responses by defendant, mostly used to indicate defendant's "answers" to Detective Kelly's questions regarding whether or not he understood his statutory and constitutional rights.
 
 Cf.
 

 Fare v. Michael C.
 
 ,
 
 442 U.S. 707
 
 , 726-27,
 
 99 S.Ct. 2560
 
 , 2572-2573,
 
 61 L.Ed.2d 197
 
 , 213 (1979) (concluding that a 16 ½-year-old juvenile "voluntarily and knowingly waived his Fifth Amendment rights" where "[t]here [was] no indication in the record that [the juvenile] failed to understand what the officers told him[,]" "no special factors indicate[d] that [the juvenile] was unable to understand the nature of his actions[,]" and the juvenile had "considerable experience with the police").
 
 But see
 
 N.C.G.S. § 7B-2101(c) ("If the juvenile indicates in any manner and at any stage of questioning pursuant to this section that the juvenile does not wish to be questioned further, the officer shall cease questioning.").
 

 Although decided almost twenty years before
 
 In re Gault
 
 , and with much more egregious facts regarding the coercion of a confession from a juvenile, the United States Supreme Court in
 
 Haley v. State of Ohio
 
 , reasoned as follows:
 

 The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law.
 

 But we are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed.
 
 [
 

 8
 

 ]
 
 That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of
 
 *458
 
 choice. We cannot indulge those assumptions.
 
 Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them
 
 . They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain.
 

 332 U.S. 596
 
 , 600-01,
 
 68 S.Ct. 302
 
 , 304-305,
 
 92 L.Ed. 224
 
 , 229 (1948) (emphasis added) (reversing a fifteen-year-old boy's conviction for murder where his confession was obtained after a five-hour-long interrogation, which began at midnight, and where the boy was not advised of his rights and was not permitted to have counsel or a parent or family member present).
 

 "The totality of the circumstances
 
 must be carefully scrutinized
 
 when determining if a youthful defendant has legitimately waived his
 
 Miranda
 
 rights."
 
 State v. Reid
 
 ,
 
 335 N.C. 647
 
 , 663,
 
 440 S.E.2d 776
 
 , 785 (1994) (emphasis added) (citing
 
 State v. Fincher
 
 ,
 
 309 N.C. 1
 
 , 19,
 
 305 S.E.2d 685
 
 , 697 (1983) ). The circumstances to consider in determining whether a waiver is voluntary (knowingly, willingly, and understandingly made) "includ[e] the background, experience, and conduct of the accused."
 
 See
 

 Simpson
 
 ,
 
 314 N.C. at 367
 
 ,
 
 334 S.E.2d at 59
 
 (citation omitted).
 

 In the instant case, there is no indication that defendant had any familiarity with the criminal justice system. Unlike the defendant in
 
 Fare v. Michael C.
 
 , there is no indication of "considerable experience with the police,"
 
 442 U.S. at 726
 
 ,
 
 99 S.Ct. at 2572
 
 ,
 
 61 L.Ed.2d at 213
 
 , and, unlike in
 
 Fare
 
 , there are factors in the record in the instant case which indicate defendant did not fully understand (or might not have fully understood) Detective
 
 *41
 
 Kelly's questions such that he freely and intelligently waived his rights.
 
 See
 
 id.
 

 ;
 
 cf.
 

 Gallegos v. Colorado
 
 ,
 
 370 U.S. 49
 
 , 54,
 
 82 S.Ct. 1209
 
 , 1212-1213,
 
 8 L.Ed.2d 325
 
 , 328 (1962) ("The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy,
 
 no matter how sophisticated
 
 , is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." (emphasis added)). Because the evidence does not support the trial court's findings of fact in the instant case that defendant "understood" Detective's Kelly's questions and statements regarding his rights, we conclude that he did not "legitimately waive[ ] his
 
 Miranda
 
 rights."
 
 *459
 

 See
 

 Fare
 
 ,
 
 442 U.S. at 726-27
 
 ,
 
 99 S.Ct. at 2572-73
 
 ,
 
 61 L.Ed.2d at 213
 
 . As a result, we decline to "give any weight to recitals," like the juvenile rights waiver form signed by defendant, "which merely formalize[d] constitutional requirements."
 
 Haley
 
 , at 601,
 
 68 S.Ct. at 304-05
 
 ,
 
 92 L.Ed. at
 
 229 ;
 
 see also
 

 Simpson
 
 ,
 
 314 N.C. at 367
 
 ,
 
 334 S.E.2d at 59
 
 .
 

 To be valid, a waiver should be voluntary, not just on its face, i.e., the paper it is written on, but
 
 in fact
 
 . It should be unequivocal and unassailable when the subject is a juvenile. The fact that the North Carolina legislature recently raised the age that juveniles can be questioned without the presence of a parent from age fourteen to age sixteen is evidence the legislature acknowledges juveniles' inability to fully and voluntarily waive essential constitutional and statutory rights.
 
 [9]
 
 Here, despite the trial court's many findings of fact that defendant "indicated he understood" Detective Kelly's questions and statements regarding his rights, the evidence as recorded contemporaneously during the questioning and as noted in testimony from the hearing, does not support those findings. Further, the findings do not reflect the scrutiny that a trial court is required to give in juvenile cases. At the very least, the evidence supporting the findings made by the trial court in the instant case was not substantial under the totality of the circumstances.
 
 See
 

 Reid
 
 ,
 
 335 N.C. at 663
 
 ,
 
 440 S.E.2d at 785
 
 .
 

 Indeed, during voir dire and in response to the question "Did [defendant] also state that he might have some issues understanding English as it is spoken as well?" Detective Kelly answered, "I believe he did." Detective Kelly also testified that defendant told her "he wasn't very good at reading English." Thus, even if defendant did sign the English version of the Juvenile Waiver of Rights form, the evidence in the record simply does not fully support that defendant knew or understood the implications of what he was signing when he was signing it.
 
 See
 

 Simpson
 
 ,
 
 314 N.C. at 367
 
 ,
 
 334 S.E.2d at 59
 
 ("[A]n express written waiver, while strong proof of the validity of the waiver, is not inevitably sufficient to establish a valid waiver." (citation omitted)).
 

 Furthermore, when Detective Kelly tells defendant "I am signing my name below," she then asks, "Do you understand this? Initial, sign, date and time," presumably instructing defendant to initial, sign, and date the
 
 English
 
 version of the form, which he does. But no response is recorded that he "understood" what was being asked by Detective Kelly-indeed, the next intelligible utterance made by defendant is "Um, can I call my mom now?" In fact, no copy of the Spanish version of the Juvenile Waiver
 
 *460
 
 of Rights form, purportedly given to defendant contemporaneously with the English version which he signed, exists in the record; defendant was instructed to initial the English version of the form, which is in the record. Thus, Finding of Fact No. 4-"[t]hat [d]efendant was advised of his juvenile rights ... in written Spanish," is not supported by competent
 
 documentary
 
 evidence in the record. Accordingly, despite defendant's "express written waiver,"
 
 see
 

 id.
 

 , the evidence does not support the trial court's ultimate conclusion that defendant executed a valid waiver.
 
 *42
 
 In addition, before beginning her questioning of defendant about multiple felony charges, Detective Kelly said, "This is not something that is going to end your life. You know what I am saying? This is not a huge deal[.]" Arguably, this statement mischaracterized the gravity of the situation in an attempt to extract information from a juvenile defendant.
 

 Although there may be no duty for an interrogating official to explain a defendant's juvenile rights in any greater detail than what is required by statute,
 
 see
 

 Flowers
 
 ,
 
 128 N.C.App. at 700
 
 ,
 
 497 S.E.2d at 97
 
 , "[i]t is well established that juveniles differ from adults in significant ways and that these differences are especially relevant in the context of custodial interrogation."
 
 Saldierna
 
 , --- N.C. at ----, 794 S.E.2d at 483 (Beasley, J., dissenting) (citations omitted). Such a mischaracterization by an interrogating official, then, surely cuts squarely against our legislature's "well-founded policy of special protections for juveniles," especially where, as here, nothing in the record indicates that defendant had any prior experience with law enforcement officers such that he would have been aware of criminal procedure generally or the consequences of speaking with the police.
 
 Cf.
 

 Fare
 
 ,
 
 442 U.S. at 726-27
 
 ,
 
 99 S.Ct. at 2572-73
 
 ,
 
 61 L.Ed.2d at 213
 
 (concluding that a 16½-year-old juvenile "voluntarily and knowingly waived his Fifth Amendment rights" where,
 
 inter alia
 
 , the juvenile had "considerable experience with the police");
 
 Simpson
 
 ,
 
 314 N.C. at 367
 
 ,
 
 334 S.E.2d at 59
 
 (considering the "background" and "experience" of the accused in determining the voluntariness of waiver);
 
 see also
 
 Cara A. Gardner,
 
 Failing to Serve and Protect: A Proposal for an Amendment to a Juvenile's Right to a Parent, Guardian, or Custodian During a Police Interrogation After
 
 State v. Oglesby,
 
 86 N.C. L. Rev. 1685
 
 , 1698 (2008) ("[The] policy of special protection [for juvenile defendants] is well-founded because of juveniles' unique vulnerabilities. Juveniles are uniquely vulnerable for two reasons: (1)
 
 they are less likely than adults to understand their rights
 
 ; and (2) they are distinctly susceptible to police interrogation techniques." (emphasis added)).
 

 Generally, we accept that the trial court resolves conflicts in the evidence and weighs the credibility of evidence and witnesses.
 
 See
 

 *461
 

 State v. O'Connor
 
 ,
 
 222 N.C.App. 235
 
 , 241,
 
 730 S.E.2d 248
 
 , 252 (2012). However, as we have noted, juvenile cases require special attention.
 
 See
 

 Reid
 
 ,
 
 335 N.C. at 663
 
 ,
 
 440 S.E.2d at 785
 
 .
 

 Our Supreme Court has determined that this juvenile's request to call his mother after signing a waiver form was not an invocation of his right to have a parent present.
 
 Saldierna
 
 , --- N.C. at ----, 794 S.E.2d at 475. However, defendant's act of requesting to call his mother immediately after he ostensibly executed a form stating he was giving up his rights, including his right to have a parent present, shows enough uncertainty, enough anxiety on the juvenile's behalf, so as to call into question whether, under all the circumstances present in this case, the waiver was (unequivocally) valid.
 

 Here, the waiver was signed in English only, and defendant's unintelligible answers to questions such as, "Do you understand these rights?" do not show a clear understanding and a voluntary waiver of those rights.
 
 [10]
 
 Defendant stated firmly to the officer that he wanted to call his mother, even after the officer asked (unnecessarily), "Now, before you talk to us?" Further, defendant reiterated this desire, even in spite of the officer's aside to other officers in the room: "He wants to call his mom." Such actions would show a reasonable person that this juvenile defendant did not knowingly, willingly, and understandingly waive his rights. Rather, his last ditch effort to call his mother (for help), after his prior attempt to call her had been unsuccessful, was a strong indication that he did not want to waive his rights at all. Yet, after a second unsuccessful attempt to reach his working parent failed, this juvenile, who had just turned sixteen years old, probably felt that he had no choice but to talk to the officers. It appears, based on this record, that defendant did not realize he had the choice to refuse to waive his rights, as the actions he took were not consistent with
 
 *43
 
 a voluntary waiver. As a result, any "choice" defendant had to waive or not waive his rights is meaningless where the record does not indicate that defendant truly understood that he had a choice at all.
 

 Furthermore, the totality of the circumstances set forth in this record ultimately do not fully support the trial court's conclusions of law, namely, "[t]hat the State carried its burden by a preponderance of the evidence that [d]efendant knowingly, willingly, and understandingly waived his juvenile rights."
 
 See
 

 Ortiz-Zape
 
 ,
 
 367 N.C. at 5
 
 ,
 
 743 S.E.2d at
 
 159 (citing
 
 Biber
 
 ,
 
 365 N.C. at 168
 
 ,
 
 712 S.E.2d at
 
 878 ) ("[C]onclusions of law are reviewed de novo and are subject to full review."). Here, too
 
 *462
 
 much evidence contradicts the English language written waiver signed by defendant, which, in any event, is merely a "recital" of defendant's purported decision to waive his rights.
 
 See
 

 Haley
 
 ,
 
 332 U.S. at 601
 
 ,
 
 68 S.Ct. at 304-305
 
 ,
 
 92 L.Ed. at 229
 
 ("[W]e cannot give any weight to recitals which merely formalize constitutional requirements."). Accordingly, it should not be considered as significant evidence of a valid waiver.
 
 See
 

 Simpson
 
 ,
 
 314 N.C. at 367
 
 ,
 
 334 S.E.2d at 59
 
 ("[A]n express
 
 written
 
 waiver, while strong proof of the validity of the waiver, is not inevitably sufficient to establish a
 
 valid
 
 waiver." (emphasis added) (citation omitted)).
 

 "Our criminal justice system recognizes that [juveniles'] immaturity and vulnerability sometimes warrant protections well beyond those afforded adults. It is primarily for that reason that a separate juvenile code with separate juvenile procedures exists."
 
 In re Stallings
 
 ,
 
 318 N.C. 565
 
 , 576,
 
 350 S.E.2d 327
 
 , 333 (1986) (Martin, J., dissenting). Indeed, "at least two empirical studies show that the vast majority of juveniles are
 
 simply incapable of understanding
 
 their
 
 Miranda
 
 rights and the meaning of waiving those rights."
 
 Oglesby
 
 ,
 
 361 N.C. at
 
 559 n.3,
 
 648 S.E.2d at
 
 824 n.3 (Timmons-Goodson, J., dissenting) (emphasis added) (citation omitted).
 

 Even for an adult, the physical and psychological isolation of custodial interrogation can undermine the individual's will to resist and ... compel him to speak where he would not otherwise do so freely. Indeed, the pressure of custodial interrogation is so immense that it can induce a frighteningly high percentage of people to confess to crimes they never committed. That risk is all the more troubling-and recent studies suggest, all the more acute-when the subject of custodial interrogation is a juvenile.
 

 J.D.B. v. North Carolina
 
 ,
 
 564 U.S. 261
 
 , 269,
 
 131 S.Ct. 2394
 
 , 2401,
 
 180 L.Ed.2d 310
 
 , 321 (2011) (alteration in original) (internal citations omitted).
 

 In conclusion, based on the totality of the circumstances, we hold the trial court erred in concluding that defendant knowingly, willingly, and understandingly waived his statutory and constitutional rights, and therefore, the trial court erred in denying defendant's motion to suppress. Accordingly, we reverse the order of the trial court, vacate the judgments entered upon defendant's guilty pleas, and remand to the trial court with instructions to grant the motion to suppress and for any further proceedings it deems necessary.
 

 VACATED, REVERSED, AND REMANDED.
 

 Chief Judge MCGEE and Judge DIETZ concur.
 

 [1]
 

 See
 

 State v. Saldierna
 
 ,
 
 242 N.C.App. 347
 
 , 348,
 
 775 S.E.2d 326
 
 , 327-30 (2015) and
 
 State v. Saldierna
 
 ,
 
 369 N.C. 401
 
 ,
 
 794 S.E.2d 474
 
 , 477-76 (2016) for more comprehensive statements of the facts.
 

 [2]
 

 The parties do not dispute that defendant was in custody at the time of questioning.
 

 [3]
 

 Notably, in 2015, the General Assembly amended subsection (b) of N.C.G.S. § 7B-2101 to raise the age from 14 to 16 with regard to the admissibility of juveniles' in-custody admissions where a parent is not present: "When the juvenile is less than 16 years of age, no in-custody admission or confession resulting from interrogation may be admitted into evidence unless the confession or admission was made in the presence of the juvenile's parent, guardian, custodian, or attorney." N.C. Sess. Laws 2015-58, § 1.1, eff. Dec. 1, 2015. At the time of his custodial interrogation on 9 October 2013, defendant in the instant case had turned 16 on 19 August 2013, less than two months before.
 

 [4]
 

 "With respect to juveniles, both common observation and expert opinion emphasize that the distrust of confessions made in certain situations ... is imperative in the case of children from an early age through adolescence."
 
 In re Gault
 
 ,
 
 387 U.S. 1
 
 , 48,
 
 87 S.Ct. 1428
 
 , 1454-1455,
 
 18 L.Ed.2d 527
 
 , 557 (1967) (internal citation omitted);
 
 see also
 

 In re J.D.B.
 
 ,
 
 564 U.S. 261
 
 , 269,
 
 131 S.Ct. 2394
 
 , 2401,
 
 180 L.Ed.2d 310
 
 , 321 (2011) ("[The] risk [of false confessions] is all the more troubling-and recent studies suggest, all the more acute-when the subject of custodial interrogation is a juvenile. See Brief for Center on Wrongful Convictions of Youth et al. as
 
 Amici Curiae
 
 21-22 (collecting empirical studies that 'illustrate the heightened risk of false confessions from youth')."). Indeed, even Justice Alito, in his dissenting opinion, acknowledged the "particular care" that must be taken with juveniles to ensure against involuntary confessions:
 

 [W]here the suspect is much younger than the typical juvenile defendant, courts should be instructed to take particular care to ensure that incriminating statements were not obtained involuntarily. The voluntariness inquiry is flexible and accommodating by nature, and the Court's precedents already make clear that "special care" must be exercised in applying the voluntariness test where the confession of a "mere child" is at issue. If
 
 Miranda
 
 's rigid, one-size-fits-all standards fail to account for the unique needs of juveniles, the response should be to rigorously apply the constitutional rule against coercion to ensure the rights of minors are protected.
 

 Id.
 
 at 297-98,
 
 131 S.Ct. at 2418
 
 ,
 
 180 L.Ed.2d at 340
 
 (Alito, J., dissenting) (internal citations omitted).
 

 [5]
 

 Four officers were involved in defendant's arrest, including Detective Kelly.
 

 [6]
 

 It is unclear whether defendant's response-"Yeah"-is a response to the first question, "Do you understand that?" or a response to the second question, "Do you want to read that?"
 

 [7]
 

 Notably, there is no recorded affirmative response by defendant to this question.
 

 [8]
 

 By stating "we are told that this boy was advised of his constitutional rights before he signed the confession,"
 
 Haley
 
 ,
 
 332 U.S. at 601
 
 ,
 
 68 S.Ct. 302
 
 at 304-305,
 
 92 L.Ed. at 229
 
 , the Supreme Court was acknowledging that contrary to the police officers' testimony otherwise, the juvenile was not, in fact, advised of his right to counsel at any time, but was only given a typed version of his confession to sign, which included language at the beginning purporting to advise the juvenile of his "constitutional rights."
 
 Id.
 
 at 598,
 
 68 S.Ct. at 303
 
 ,
 
 92 L.Ed. at 228
 
 .
 

 [9]
 

 See supra
 
 note 3.
 

 [10]
 

 See supra
 
 notes 6 and 7 and accompanying text.