IN THE SUPREME COURT OF NORTH CAROLINA

No. 271PA15-2

Filed 17 August 2018

STATE OF NORTH CAROLINA

v.

FELIX RICARDO SALDIERNA


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 803 S.E.2d 33 (2017), reversing an order denying defendant's motion to suppress entered on 20 February 2014 by Judge Forrest Donald Bridges, vacating a judgment entered on 4 June 2014 by Judge Jesse B. Caldwell, both in Superior Court, Mecklenburg County, and remanding the case for further proceedings after the Supreme Court of North Carolina remanded the Court of Appeals' prior decision in this case, *State v. Saldierna*, 242 N.C. App. 347, 775 S.E.2d 326 (2015). Heard in the Supreme Court on 14 May 2018 in session in the Old Burke County Courthouse in the City of Morganton pursuant to N.C.G.S. § 7A-10(a).

*Joshua H. Stein, Attorney General, by Kimberly N. Callahan, Assistant Attorney General, for the State-appellant.*

*Goodman Carr, PLLC, by W. Rob Heroy, for defendant-appellee.*

ERVIN, Justice.

The issue before the Court in this case is whether the trial court's order denying defendant's suppression motion contained sufficient findings of fact to support its conclusion that defendant knowingly and voluntarily waived his juvenile rights pursuant to N.C.G.S. § 7B-2101 before making certain incriminating statements. After careful consideration of defendant's challenge to the denial of his suppression motion in light of the record and the applicable law, we hold that the trial court's order contained sufficient findings to support this conclusion and reverse the decision of the Court of Appeals to the contrary.

From 26 November 2012 to 3 January 2013, defendant Felix Ricardo Saldierna and seven other individuals were involved in a series of breakings and enterings that occurred in the Charlotte area. After coming home from work on 17 December 2012, Cheryl Brewer[1] discovered that someone had entered her residence through a broken window, scrawled "Merry Chritmas" [sic] across a wall, and stolen a 32-inch television and a lock box. On 18 December, a 42-inch television, an Xbox game system, and jewelry were stolen from the residence of William Nunez. Another individual suspected in the commission of these crimes told investigating officers that defendant had been involved in the underlying break-ins. In January 2013, warrants for arrest charging defendant with felonious breaking or entering and conspiracy to commit

---

[1] The name of the victim set out in the text of this opinion is derived from the factual basis statement provided by the prosecutor at the time that defendant entered his negotiated guilty plea. The indictment returned against defendant in the relevant cases named the alleged victim as Cheryl Drew.

breaking or entering were issued. Based upon the issuance of these warrants for arrest, defendant was taken into custody at his home in Fort Mill, South Carolina.

After having been placed under arrest, defendant was transported to the York County Justice Center, where he was interviewed by Detective Aimee Kelly of the Charlotte-Mecklenburg Police Department. At the beginning of this interview, Detective Kelly informed defendant that she was required to inform him of his rights. Defendant responded to Detective Kelly's statement by telling her that "my English is good, but like when you say something like that much it's kind of confusing." After stating that he was sixteen years old, defendant informed Detective Kelly that he was taking courses intended for both freshman and sophomore high school students. When Detective Kelly asked defendant if he could read, defendant responded in the affirmative before adding that he could read English "kind of, a little bit," and that he could read Spanish. At that point, Detective Kelly told defendant that she would provide him with a copy of a juvenile rights waiver form in both English and Spanish so that he would be able to read along with her while she informed him of his rights. At the conclusion of this portion of their discussion, Detective Kelly and defendant had the following exchange:

> [Kelly]: You understand I'm a police officer, right?
>
> [Defendant]: Yes ma[']am[.]
>
> [Kelly]: Ok, and that I would like to talk to you about this. And this officer has also explained to me and I understand that I have the right to remain silent, that means that I

don't have to say anything or answer any questions. Should be right there number 1 right on there. Do you understand that?

[Defendant]: [unintelligible] questions?

[Kelly]: Yes, that is your right? So do you understand that? If you understand that, put your initials right there showing that you understand that. On this sheet. On this one. You can put it on both. Anything I say can be used against me. Do you understand that?

[Defendant]: Yes ma[']am.

[Kelly]: I have the right to have a parent[,] guardian or custodian here with me now during questioning. Parent means my mother, father, stepmother, or stepfather. Guardian means the person responsible for taking care of me. Custodian means the person in charge of me where I am living. Do you understand that? Do you want to read that?

[Defendant]: Yeah.

[Kelly]: Do you understand that?

[Defendant]: [no response]

[Kelly]: I have the right to talk to a lawyer and to have a lawyer here with me now to advise and help during questioning. Do you understand that?

[Defendant]: [unintelligible]

[Kelly]: If I want to have a lawyer with me during questioning one will be provided to me at no cost before any questioning. Do you understand that?

[Defendant]: Yes ma[']am.

[Kelly]: Ok.  Now I want to talk to you about some stuff that's happened in Charlotte.  And um, I will tell you this.  There's been some friends of yours that have already been questioned about these items and these issues.  And they've been locked up.  And that's what I want to talk to you about.  Do you want to help me out and to help me understand what's been going on with some of these cases and talk to me about this now here?

[Defendant]: Uh

[Kelly]: Are you willing to talk to me is what I'm asking.

[Defendant]: Yes ma[']am.

[Kelly]: Ok.  So I am 14 years or more.  Let me see that pen.  And I understand my rights as they've been explained by [D]etective Kelly.  I do wish to answer questions now without a lawyer, parent, guardian or custodian here with me?  My decision to answer questions now is made freely and is my own choice.  No one has threatened me in any way or has promised me any special treatment because I have decided to answer questions now.  I am signing my name below.  Do you understand this?  Initial, sign, date and time.

[Kelly]: It is 1/9/13.  It is 12:10PM.

[Defendant]: Um, Can I call my mom?

[Kelly]: Call your mom now?

[Defendant]: She's on her um. I think she is on her lunch now.

[Kelly]: You want to call her now before we talk?

[Kelly] [to other officers]:  He wants to call his mom.

. . . .

[Other Officer]:      [S]tep back outside and we'll let you call your mom outside. . . .

. . . .

9:50: [Defendant] [can be heard on phone. Call is not intelligible.]

. . . .

[Kelly]: 12:20: Alright Felix, so, let's talk about this thing going on. Like I said a lot of your friends have been locked up and everybody's talking. They're telling me about what's going on and what you've been up to. I'm not saying you're the ringleader of this here thing and some kind of mastermind right but I think you've gone along with these guys and gotten yourself into a little bit of trouble here. This is not something that's going to end your life. You know what I'm saying. This is not a huge deal. I know you guys were going into houses when nobody was home. You weren't looking to hurt anybody or anything like that. I just want to hear your side of the story. We can start off. I'm going to ask you questions I know the answer to. A lot of these questions are to tell if you're being truthful to me.

At that point, Detective Kelly interviewed defendant for approximately fifty-four minutes concerning the extent of his involvement in the commission of the crimes that Detective Kelly was investigating. During the course of the ensuing interrogation, defendant confessed to having been involved in the break-ins that had occurred at the residences of Ms. Brewer and Mr. Nunez.

On 22 January 2013, the Mecklenburg County grand jury returned bills of indictment charging defendant with two counts of conspiracy to commit felonious breaking, entering, and larceny and two counts of felonious breaking or entering. On

9 October 2013, defendant filed a motion seeking to have his confession and all of the evidence that the State had obtained as a result of the statements that defendant made to Detective Kelly suppressed on the grounds that his confession had been obtained as the result of violations of N.C.G.S. § 7B-2101 and his federal constitutional right not to be deprived of liberty without due process of law. According to defendant, "[b]y asking to speak to his mother prior to questioning, [d]efendant invoked his rights under N.C.G.S. § 7B-2101." In addition, defendant alleged that, in light of his "indicat[ion] that he was not ready to be questioned without her," "[t]he interview should have ceased at that moment and not continued until [d]efendant's mother was present, or should have simply ceased."

On 31 January 2014, defendant's suppression motion came on for hearing before Judge Forrest Donald Bridges in the Superior Court, Mecklenburg County. At the suppression hearing, Detective Kelly testified that, while defendant "spoke English clearly and understood what [she] was saying," "[he] said he wasn't very good at reading English." Although Detective Kelly acknowledged that defendant might have claimed to have had "some issues understanding English," she stated that defendant "seemed to very clearly understand what [she] was asking him" and that she had had no trouble understanding defendant at any point during the interview. Detective Kelly "found [defendant's English] to be fine" and believed "that he understood [his juvenile] rights." According to Detective Kelly, defendant followed

along and initialed the relevant portions of the juvenile rights waiver form while she read his juvenile rights to him.

In addition, Detective Kelly asserted at the suppression hearing that defendant "never said he wanted his mother [at the interview]." On the other hand, Detective Kelly did not ask defendant "whether or not he was ready to proceed" after he requested to be allowed to speak with his mother. In fact, defendant had signed the juvenile rights waiver form before asking the investigating officers to give him an opportunity to call his mother. Detective Kelly had an "understanding" that defendant had called his mother "to let her know where he was and that he was arrested."

On 20 February 2014, the trial court entered an order denying defendant's suppression motion in which the court found as a fact:

> 1.     That Defendant was in custody.
>
> 2.     That Defendant was advised of his juvenile rights pursuant to North Carolina General Statute § 7B-2101.
>
> 3.     That Detective Kelly of the Charlotte-Mecklenburg Police Department advised Defendant of his juvenile rights.
>
> 4.     That Defendant was advised of his juvenile rights in three manners. Defendant was advised of his juvenile rights in spoken English, in written English, and in written Spanish.
>
> 5.     That Defendant indicated that he understood his juvenile rights as given to him by Detective Kelly.

6.     That Defendant indicated he understood his rights after being given and reviewing a form enumerating those rights in Spanish.

7.     That Defendant indicated that he understood that he had the right to remain silent.  Defendant understood that to mean that he did not have to say anything or answer any questions.  Defendant initialed next to this right at number 1 on the English rights form provided to him by Detective Kelly to signify his understanding.

8.     That Defendant indicated he understood that anything he said could be used against him.  Defendant initialed next to this right at number 2 on the English rights form provided to him by Detective Kelly to signify his understanding.

9.     That Defendant indicated he understood that he had the right to have a parent, guardian, or custodian there with him during questioning.  Defendant understood the word parent meant his mother, father, stepmother, or stepfather.  Defendant understood the word guardian meant the person responsible for taking care of him. Defendant understood the word custodian meant the person in charge of him where he was living. Defendant initialed next to this right at number 3 on the English rights form provided to him by Detective Kelly to signify his understanding.

10.     That Defendant indicated he understood that he had the right to have a lawyer and that he had the right to have a lawyer there with him at the time to advise and help him during questioning.  Defendant initialed next to this right at number 4 on the English rights form provided to him by Detective Kelly to signify his understanding.

11.     That Defendant indicated he understood that if he wanted a lawyer there with him during questioning, a lawyer would be provided to him at no cost prior to questioning.   Defendant initialed next to this right at

number 5 on the English rights form provided to him by Detective Kelly to signify his understanding.

12.     That Defendant initialed a space below the enumerated rights on the English rights form that stated the following: "I am 14 years old or more and I understand my rights as explained by Detective Kelly.  I DO wi[s]h to answer questions now, WITHOUT a lawyer, parent, guardian, or custodian here with me.  My decision to answer questions now is made freely and is my own choice.  No one has threatened me in any way or promised me special treatment.  Because I have decided to answer questions now, I am signing my name below."

13.     That Defendant's signature appears on the English rights form below the initialed portions of the form.  Defendant's signature appears next to the date, 1-9-13, and the time, 12:10.  Detective Kelly signed her name as a witness below Defendant's signature.

14.     That after being informed of his rights, informing Detective Kelly he wished to waive those rights, and signing the rights form, Defendant communicated to Detective Kelly that he wished to contact his mother by phone.  Defendant was given permission to do so.

15.     That Defendant attempted to call his mother, but was unable to speak to her.

16.     That Defendant indicated that his mother was on her lunch break at the time he tried to contact her.

17.     That Defendant did not at that time or any other time indicate that he changed his mind regarding his desire to speak to Detective Kelly.  That Defendant did not at that time or any other time indicate that he revoked his waiver.

18.     That Defendant only asked to speak to his mother.

19.     That Defendant did not make his interview conditional on having his mother present or conditional on speaking to his mother.

20.     That Defendant did not ask to have his mother present at the interview site.

21.     That, upon review of the totality of the circumstances, the Court finds that Defendant's request to speak to his mother was at best an ambiguous request to speak to his mother.

22.     That at no time did Defendant make an unambiguous request to have his mother present during questioning.

23.     That Defendant never indicated that his mother was on the way or could be present during questioning.

24.     That Defendant made no request for a delay of questioning.

Based upon these findings of fact, the trial court concluded as a matter of law:

1.     That the State carried its burden by a preponderance of the evidence that Defendant knowingly, willingly, and understandingly waived his juvenile rights.

2.     That the interview process in this case was consistent with the interrogation procedures as set forth in North Carolina General Statute § 7B-2101.

3.     That none of Defendant's State or Federal rights were violated during the interview conducted of Defendant.

4.     That statements made by Defendant were not gathered as a result of any State or Federal rights violation.

In light of these findings and conclusions, the trial court denied defendant's suppression motion.

On 4 June 2014, defendant entered a negotiated plea of guilty to two counts of felonious breaking or entering and two counts of conspiracy to commit breaking or entering while reserving the right to seek appellate review of the denial of his suppression motion.[2] Based upon defendant's plea, Judge Caldwell consolidated defendant's convictions for judgment and entered a judgment sentencing defendant to a term of six to seventeen months imprisonment, with this sentence being suspended and defendant placed on supervised probation for a period of thirty-six months on the condition that defendant serve a forty-five day active sentence, for which he received forty-five days' credit for time spent in pretrial confinement; pay the costs; comply with the usual terms and conditions of probation; and have no contact with the victim.[3] Defendant noted an appeal from Judge Caldwell's judgment to the Court of Appeals.

---

[2] The plea agreement between defendant and the State provided that, in return for defendant's guilty pleas, the State would voluntarily dismiss one additional count of felonious breaking or entering, one count of conspiracy to break or enter, and three counts of felonious larceny and that defendant would receive a sentence of six to seventeen months imprisonment, with this sentence to be suspended and with defendant to be on supervised probation for a period of thirty-six months, with the terms and conditions of defendant's probation including a requirement that he serve a forty-five day split sentence, subject to credit for time served in pretrial confinement, and that he be subject to intensive probation for a period of one year.

[3] The final page of Judge Caldwell's judgment was omitted from the record on appeal. Having obtained a copy of that page from the office of the Clerk of Superior Court, Mecklenburg County, we have added it to the record on appeal upon our own motion pursuant to N.C.R. App. P. 9(b)(5)b.

In seeking relief from the Court of Appeals, defendant argued that his request to call his mother during his conversation with Detective Kelly had constituted "an unambiguous invocation of his right to have a parent present during a custodial interrogation" and that, in the alternative, even if his request for the presence of his mother had been ambiguous, "[Detective] Kelly was required to make further inquiries to clarify whether he actually meant that he was invoking his right to end the interrogation until his mother was present." *State v. Saldierna*, 242 N.C. App. 347, 353, 775 S.E.2d 326, 330 (2015) (*Saldierna I*). In addition, defendant contended that the trial court had failed to "appropriately consider his juvenile status in determining that his waiver of rights was knowing and voluntary." *Id.* at 354, 775 S.E.2d at 331.

In holding that the trial court had erred by denying defendant's suppression motion, the Court of Appeals determined "that[, while] the findings of fact regarding the ambiguous nature of [defendant's] statement, 'Can I call my mom[,]' are supported by competent evidence," the "ambiguous [nature of that] statement required [Detective] Kelly to clarify whether [defendant] was invoking his right to have a parent present during the interview." *Id.* at 360, 775 S.E.2d at 334. As a result, the Court of Appeals held "that the trial court erred in concluding that [Detective] Kelly complied with the provisions of section 7B-2101" and "reverse[d] the trial court's order, vacate[d] the judgments entered upon [defendant's] guilty pleas, and remand[ed] to the trial court with instructions to grant the motion to suppress."

*Id*. at 360, 775 S.E.2d at 334. This Court granted the State's petition seeking discretionary review of the Court of Appeals' decision, reversed that decision, and remanded this case to the Court of Appeals for consideration of defendant's remaining challenge to the trial court's suppression order. *State v. Saldierna*, 369 N.C. 401, 409, 794 S.E.2d 474, 479 (2016).[4]

In overturning the Court of Appeals' decision in *Saldierna I*, this Court concluded that defendant's statement, "Um, [c]an I call my mom?", did not constitute "a clear and unambiguous invocation of his right to have his parent or guardian present during questioning." *Id*. at 408, 794 S.E.2d at 479 (citing *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362, 371 (1994) (holding that invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney")). "Although defendant asked to call his mother, he never gave any indication that he wanted to have her present for his interrogation, nor did he condition his interview on first speaking with her." *Id*. at 408, 794 S.E.2d at 479. As a result, we determined that the Court of Appeals had erred by holding that the ambiguous nature of defendant's request to be allowed to call his mother required

---

[4] Justice Beasley dissented from the Court's decision to reverse the Court of Appeals based upon her belief that the record established that defendant had unambiguously invoked his right to the presence of a parent and that investigating officers had an obligation to obtain clarification of any ambiguous statement that defendant may have made regarding the extent to which he desired the presence of a parent prior to being interrogated by Detective Kelly. *Saldierna*, 369 N.C. at 409, 794 S.E.2d at 479-80 (Beasley, J., dissenting).

Detective Kelly to make further inquiry into the extent to which defendant intended to invoke his right to have his mother present before any custodial interrogation could commence. *Id.* at 409, 794 S.E.2d at 479.

On remand before the Court of Appeals, defendant argued that the trial court had erred by denying his suppression motion on the grounds that his confession had been obtained as the result of a violation of both his statutory and constitutional rights as a juvenile. According to defendant, the United States Supreme Court held in *J.D.B. v. North Carolina* "that reviewing courts must take into account the juvenile's age and maturity when determining the admissibility of a confession, and not to evaluate the confession as if the juvenile were an adult," citing *J.D.B.*, 564 U.S. 261, 272, 131 S. Ct. 2394, 2403, 180 L. Ed. 2d 310, 323-24 (2011). Defendant argued "that the *Davis* test should not be applied to the context of a juvenile interrogation" because "*Davis* involved an adult," because "the [United States] Supreme Court did not announce that the rule applied equally to juvenile confessions," and because "the [United States] Supreme Court has made clear . . . that juvenile confessions should be evaluated differently than adult confessions," citing, *inter alia, In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 257 (1967), and *J.D.B.*, 564 U.S. 261, 131 S. Ct. 2394, 180 L. Ed. 2d 310.

In addition, defendant argued that, in light of the totality-of-the-circumstances approach outlined in *J.D.B.*, the trial court had erred by failing to consider that defendant "was in custody and outnumbered by three law enforcement officers"; had

"stated to the detective plainly, '[c]an I call my mom now?' "; was sixteen years old and had only completed the eighth grade as of the date of the interrogation; "indicated to [Detective Kelly] that his native language was Spanish, that he could not write in English, and he may have stated he had difficulty understanding" Detective Kelly; provided "unclear" responses to questions that Detective Kelly posed during the interrogation; and expressed a desire to call his mother. According to defendant, an analysis of the totality of the circumstances surrounding defendant's interrogation established that the trial court had erred by finding that defendant had knowingly and voluntarily waived his statutory and constitutional rights.

The State, on the other hand, argued before the Court of Appeals that defendant had knowingly, willingly, and understandingly waived his juvenile rights when he was advised of those rights in spoken English, written English, and written Spanish; had acknowledged that he understood those rights; and had expressed, both verbally and in writing, his willingness to waive those rights. "[A]s [ ] evidence of his understanding and intention to proceed with the interview," the State pointed to the fact that defendant had "signed each paragraph of the Rights Waiver Form" and had gone "on to answer Detective Kelly's questions for nearly an hour without ever once indicating . . . . he did not understand the rights read to him or that he was at all unclear about the choice he made to answer questions." Although "age is to be considered by the trial judge," the State asserted that defendant's juvenile status and grade level did not preclude him from understanding and waiving his juvenile rights.

Moreover, the State claimed that "[t]here is no evidence of mistreatment or coercion" during the interrogation. In spite of the fact that it involved the interrogation of an adult rather than a juvenile, the State contended that the United States Supreme Court's decision in *Davis* remains applicable in determining whether defendant had validly waived his juvenile rights. Finally, the State argued that defendant's reliance upon *J.D.B.* was misplaced given that *J.D.B.* involved the issue of a juvenile's age as "relevant to the determination of whether the child was considered to have been 'in custody' for *Miranda* purposes" and given that the United States Supreme Court had stated in *J.D.B.* that "a child's age will [not] be determinative, or even a significant factor in every case," quoting *J.D.B.*, 564 U.S. at 277, 131 S. Ct. at 2406, 180 L. Ed. 2d at 326.

In holding that the trial court had erred by denying defendant's suppression motion, the Court of Appeals concluded on remand that defendant did not "knowingly, willingly, and understandingly waive[ ] his rights under section 7B-2101 of the North Carolina General Statutes and under the constitutions of North Carolina and the United States." *State v. Saldierna*, ___ N.C. App. ___, ___, 803 S.E.2d 33, 35 (2017) (*Saldierna II*). In reaching this conclusion, the Court of Appeals explained that, "[w]hether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused." *Id*. at ___, 803 S.E.2d at 36 (quoting *State v. Simpson*, 314 N.C. 359, 367, 334 S.E.2d 53, 59 (1985)). According to the Court of Appeals, "[t]he totality of

-17-

the circumstances *must be carefully scrutinized* when determining if a youthful defendant has legitimately waived his *Miranda* rights," *id.* at ___, 803 S.E.2d at 40 (quoting *State v. Reid*, 335 N.C. 647, 663, 440 S.E.2d 776, 785 (1994) (emphasis added)), given that juveniles possess "unique vulnerabilities," in that "(1) they are less likely than adults to understand their rights; and (2) they are distinctly susceptible to police interrogation techniques," *id.* at ___, 803 S.E.2d at 42 (emphasis omitted) (quoting Cara A. Gardner, *Failing to Serve and Protect: A Proposal for an Amendment to a Juvenile's Right to a Parent, Guardian, or Custodian During a Police Interrogation After* State v. Oglesby, 86 N.C. L. Rev. 1685, 1698 (2008)).

The Court of Appeals stated that, "despite the trial court's many findings of fact that defendant 'indicated he understood' Detective Kelly's questions and statements regarding his rights, the evidence as recorded contemporaneously during the questioning and as noted in testimony from the hearing, does not support those findings." *Id.* at ___, 803 S.E.2d at 41. In addition, the Court of Appeals stated that "the findings do not reflect the scrutiny that a trial court is required to give in juvenile cases." *Id.* at ___, 803 S.E.2d at 41. Among other things, the Court of Appeals noted that "no response [was] recorded that [defendant] 'understood' " that Detective Kelly had asked defendant to initial, sign, and date the English version of the juvenile rights waiver form. *Id.* at ___, 803 S.E.2d at 41. For that reason, the Court of Appeals held that the finding of fact " '[t]hat [d]efendant was advised of his juvenile rights . . . in written Spanish,' is not supported by competent *documentary* evidence in the

record" and that "the evidence does not support the trial court's ultimate conclusion that defendant executed a valid waiver." *Id.* at ___, 803 S.E.2d at 41 (alterations in original). As a result, the Court of Appeals determined that "the totality of the circumstances set forth in this record ultimately do not fully support the trial court's conclusions of law, namely, '[t]hat the State carried its burden by a preponderance of the evidence that [d]efendant knowingly, willingly, and understandingly waived his juvenile rights.'" *Id.* at ___, 803 S.E.2d at 43 (alterations in original). This Court granted the State's petition for discretionary review of the Court of Appeals' remand decision in *Saldierna II* on 1 November 2017.

In seeking to persuade us to reverse the Court of Appeals' decision, the State claims that the Court of Appeals failed to properly apply the applicable standard of appellate review. According to the State, the Court of Appeals should have focused upon determining "whether the unchallenged findings of fact supported the trial court's conclusion of law that defendant knowingly and voluntarily waived his juvenile rights." The State further contends that, even if the trial court's findings had been challenged by defendant as lacking in sufficient evidentiary support, they would nevertheless be "conclusive on appeal" because they were "supported by competent evidence, even if the evidence is conflicting," quoting *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), *cert. denied*, 513 U.S. 1096, 115 S. Ct. 764, 130 L. Ed. 2d 661 (1995). In the State's view, the audio recording of defendant's interview with Detective Kelly "demonstrates that defendant had the ability to

understand Detective Kelly as she read him his juvenile rights." In addition, the State notes that, in instances in which defendant failed to provide an audible response to Detective Kelly's inquiries concerning the extent to which defendant understood specific juvenile rights, defendant placed his initials by the relevant paragraph on the juvenile rights waiver form. Finally, the State asserts that Detective Kelly's suppression hearing testimony sufficed to support the trial court's findings to the effect that defendant understood Detective Kelly as she read his juvenile rights to him.

Defendant, on the other hand, contends that the State failed to meet its burden of demonstrating that he knowingly, willingly, and understandingly waived his statutory and constitutional rights. According to defendant, this Court should consider defendant's youth, his request to call his mother, the number of officers present during the interrogation, and the misleading statements made to defendant by investigating officers in determining that the trial court had erred by denying defendant's suppression motion. In spite of the fact that defendant had initialed the juvenile rights waiver form, defendant argues that the fact that his responses to Detective Kelly's questions regarding the extent to which he understood his rights were unclear indicates that he had not understood the questions that Detective Kelly had posed to him. In addition, defendant notes that the trial court failed to make any findings of fact concerning defendant's "experience, education, background, . . . intelligence," and "capacity to understand the warnings given [to] him" as required

by the totality-of-the-circumstances analysis enunciated in *Fare v. Michael C.*, quoting *Fare*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2571, 61 L. Ed. 2d 197, 212 (1979). In light of these deficiencies in the trial court's findings of fact and the fact that, in the Court of Appeals' view, the relevant findings were actually mixed findings of fact and conclusions of law, defendant contends that the Court of Appeals appropriately examined the evidence anew, citing, *inter alia, Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 548, 356 S.E.2d 578, 586-87 (1987), and had not committed any error of law in the course of overturning the trial court's suppression order.

"The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011) (citation omitted). The trial court's findings of fact "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *Eason*, 336 N.C. at 745, 445 S.E.2d at 926. "The conclusions of law made by the trial court from such findings, however, are fully reviewable on appeal." *State v. McCollum*, 334 N.C. 208, 237, 433 S.E.2d 144, 160 (1993) (citation omitted), *cert. denied*, 512 U.S. 1254, 114 S. Ct. 2784, 129 L. Ed. 2d 895 (1994), *post-conviction relief granted, State v. McCollum*, No. 83 CRS 15506-07, 2014 WL 4345428 (N.C. Super. Ct. Robeson County Sept. 2, 2014) (order vacating defendant's convictions and the trial court's judgment, and mandating defendant's immediate release from custody).

"[A]n appellate court accords great deference to the trial court . . . because it is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision, in the first instance, as to whether or not a constitutional violation of some kind has occurred." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619-20 (1982).

N.C.G.S. § 7B-2101(a) states that

> (a)     [a]ny juvenile in custody must be advised prior to questioning:
>
> (1)   That the juvenile has a right to remain silent;
>
> (2)   That any statement the juvenile does make can be and may be used against the juvenile;
>
> (3)   That the juvenile has a right to have a parent, guardian, or custodian present during questioning; and
>
> (4)   That the juvenile has a right to consult with an attorney and that one will be appointed for the juvenile if the juvenile is not represented and wants representation.

N.C.G.S. § 7B-2101(a) (2015).[5]  The relevant statutory language is clearly intended to codify the rights afforded to a juvenile subjected to custodial interrogation

---

[5] At the time that the interrogation at issue in this case occurred, N.C.G.S. § 7B-2101(b) provided that, "[w]hen the juvenile is less than 14 years of age, no in-custody admission or confession resulting from interrogation may be admitted into evidence unless the confession or admission was made in the presence of the juvenile's parent, guardian, custodian, or attorney."  For offenses committed on or after 1 December 2015, the General Assembly amended N.C.G.S. § 7B-2101(b) by raising the age at which the presence of the juvenile's parent, guardian, custodian, or attorney is required from less than fourteen to less than sixteen.  Act of May 26, 2015, ch. 58, secs. 1.1, 4. 2015 N.C. Sess. Laws 126, 126, 130.

pursuant to *Miranda* in addition to affording a juvenile the State statutory right to have a parent, guardian, or custodian present during the interrogation process. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 706-07 (1966) (holding that, "[p]rior to any questioning, [a] person [subjected to custodial interrogation] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," although "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently"). "If the juvenile indicates in any manner and at any stage of questioning pursuant to this section that the juvenile does not wish to be questioned further, the officer shall cease questioning." N.C.G.S. § 7B-2101(c). "Before admitting into evidence any statement resulting from custodial interrogation, the court shall find that the juvenile knowingly, willingly, and understandingly waived the juvenile's rights." *Id.* § 7B-2101(d) (2017). The State "bears the burden of demonstrating that the waiver was knowingly and intelligently made, and an express written waiver, while strong proof of the validity of the waiver, is not inevitably sufficient to establish a valid waiver." *Simpson*, 314 N.C. at 367, 334 S.E.2d at 59 (citations omitted); *see also State v. Thibodeaux*, 341 N.C. 53, 58,

---

However, given that defendant was sixteen years old at the time of the interrogation at issue in this case, neither version of N.C.G.S. § 7B-2101(b) would have barred the admission of defendant's incriminating statements concerning his involvement in the unlawful break-ins at the residence of Ms. Brewer and Mr. Nunez.

459 S.E.2d 501, 505 (1995) (explaining that "[t]he State has the burden of showing by a preponderance of the evidence that the defendant made a knowing and intelligent waiver of his rights and that his statement was voluntary"). "Whether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused." *Simpson,* 314 N.C. at 367, 334 S.E.2d at 59 (citations omitted). As a result, "the court [is required to look] at the totality of the circumstances surrounding the statement" in order to determine whether the State has adequately established that a waiver was knowingly and intelligently made. *Thibodeaux,* 341 N.C. at 58, 459 S.E.2d at 505.

"This totality-of-the-circumstances approach is adequate to determine whether there was been a waiver even where interrogation of juveniles is involved." *Fare,* 442 U.S. at 725, 99 S. Ct. at 2572, 61 L. Ed. 2d at 212. "The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation," including "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his . . . rights, and the consequences of waiving those rights." *Id.* at 725, 99 S. Ct. at 2572, 61 L. Ed. 2d at 212 (citing *North Carolina v. Butler,* 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)). In applying the totality-of-the-circumstances test in cases involving the custodial interrogation of juveniles, we have noted that "the record must be carefully scrutinized, with

particular attention to both the characteristics of the accused and the details of the interrogation." *State v. Fincher*, 309 N.C. 1, 19, 305 S.E.2d 685, 697 (1983) (quoting *State v. Spence*, 36 N.C. App. 627, 629, 244 S.E.2d 442, 443, *disc. rev. denied*, 295 N.C. 556, 248 S.E.2d 734 (1978)). However, a defendant's juvenile status "does not compel a determination that he did not knowingly and intelligently waive his *Miranda* rights." *Id*. at 19, 305 S.E.2d at 696-97 (citation omitted). Instead, the juvenile's age is a factor to consider along with "the characteristics of the accused and the details of the interrogation." *Id.* at 19, 305 S.E.2d at 697 (quoting *Spence*, 309 N.C. at 629, 244 S.E.2d at 443).

A careful review of the record satisfies us that the trial court's findings of fact have adequate evidentiary support and that those findings support the trial court's conclusion that defendant knowingly and voluntarily waived his juvenile rights. In reaching a contrary conclusion, the Court of Appeals failed to focus upon the sufficiency of the evidence to support the findings of fact that the trial court actually made and to give proper deference to those findings. *Cooke*, 306 N.C. at 134, 291 S.E.2d at 619-20. Although the Court of Appeals concluded that "the evidence does not support the trial court's findings of fact . . . that defendant 'understood' Detective Kelly's questions and statements regarding his rights," *Saldierna II*, ___ N.C. App. at ___, 803 S.E.2d at 41, the record contains ample support for the trial court's determination that defendant understood his juvenile rights, with this determination resting upon the existence of evidence tending to show that Detective Kelly advised

defendant of his juvenile rights in spoken English, written Spanish, and written English;[6] that defendant initialed each of the rights enumerated on the juvenile rights waiver form that Detective Kelly reviewed with him and signed the juvenile rights waiver form in such a manner as to indicate that he had decided to waive his juvenile rights and to speak with Detective Kelly without the presence of a parent, guardian, custodian, or attorney; that defendant answered affirmatively when questioned about the extent to which he understood his rights; and that defendant "understood what [Detective Kelly] was saying." As a result, we hold that the Court of Appeals erred in determining that the record did not support the trial court's findings to the effect that defendant understood his juvenile rights.

Admittedly, the record does contain evidence that would have supported a different determination concerning the issue of whether defendant understood the juvenile rights that were available to him. For example, the record does reflect that some of defendant's responses to Detective Kelly's inquiries concerning the extent to which he understood certain of his rights were "unintelligible" and that English was not defendant's primary language. However, given the evidence recited above, including Detective Kelly's suppression hearing testimony that defendant "seemed to very clearly understand what [she] was asking him" and that his English was "fine,"

---

[6] In spite of the fact that the record does not contain the Spanish language version of the juvenile rights waiver form, the trial court's determination that defendant was informed of his juvenile rights in written form using the Spanish language is amply supported by Detective Kelly's suppression hearing testimony.

the record concerning the extent to which defendant was able to understand the English language in general and Detective Kelly's questions in particular was, at most, in conflict. According to well-established North Carolina law, resolution of such evidentiary conflicts is a matter for the trial court, which has the opportunity to see and hear the witnesses, rather than an appellate court, which is necessarily limited to consideration of a cold record even in cases involving audio recordings and videographic evidence.

In addition, the trial court's findings support its conclusion of law that "[d]efendant knowingly, willingly, and understandingly waived his juvenile rights." Among other things, the record contains defendant's express written waiver of his juvenile rights which, while not determinative, is "strong proof of the validity of the waiver." *Simpson*, 314 N.C. at 367, 334 S.E.2d at 59. In addition to the express written waiver, the record contains evidence tending to show, and the trial court found, that defendant was advised of his rights in both written English and Spanish and in spoken English. Moreover, the transcript of defendant's interview with Detective Kelly indicates that, in all but two instances, defendant verbally affirmed that he understood his rights and that he was willing to answer Detective Kelly's questions. Aside from the fact that defendant's suggestion that the inaudibility of certain of defendant's responses demonstrated that he did not understand his rights conflicts with Detective Kelly's suppression hearing testimony to the contrary and the fact that the record contains no evidence tending to show that defendant ever

expressed a lack of willingness to speak with Detective Kelly, sought to invoke his rights, or was unable to adequately communicate with the investigating officers, this aspect of defendant's argument represents, in essence, an attempt to persuade us to reweigh the evidence and reach a different result with respect to a factual issue other than that deemed appropriate by the trial court. Similarly, the Court of Appeals' determinations that defendant's request to call his mother "shows enough uncertainty, enough anxiety on [defendant's] behalf, so as to call into question whether, under all the circumstances present in this case, the waiver was (unequivocally) valid" and that defendant's "last ditch effort to call his mother (for help), after his prior attempt to call her had been unsuccessful,[7] was a strong indication that he did not want to waive his rights at all," *Saldierna II*, ___ N.C. App. at ___, 803 S.E.2d at 42, are inconsistent with the trial court's findings of fact concerning the circumstances surrounding defendant's attempt to call his mother, which we have already found to have adequate record support. Finally, the record contains no allegations of coercive police conduct or the use of improper interrogation techniques.[8] As a result, we hold that the trial court did not err by concluding that

---

[7] A number of statements that were made by investigating officers during Detective Kelly's interview with defendant suggest that defendant had made an earlier, unsuccessful attempt to reach his mother before the phone call reflected in the interview transcript.

[8] Both defendant and the Court of Appeals appear to assert that Detective Kelly's statement to defendant that "[t]his is not something that's going to end your life" and "is not a huge deal" constituted a deceptive statement that should be weighed in favor of a finding that defendant had not voluntarily waived his juvenile rights. We are acutely aware that the incurrence of a felony conviction can have significant, and lasting, effects upon a juvenile's

defendant had knowingly, willingly, and understandingly waived his juvenile rights and that the Court of Appeals' decision to the contrary should be reversed.[9]

REVERSED.

---

prospects. However, we are not persuaded that the statement in question constitutes official misconduct sufficient to compel a conclusion that defendant's will was overborne at the time that he decided to waive his juvenile rights and speak with Detective Kelly and believe that it simply reflects Detective Kelly's opinion that defendant was not suspected of having committed other, more serious criminal offenses.

[9] A considerable amount of defendant's argument to this Court focuses upon policy, rather than legal or evidentiary, considerations. Although defendant points to a substantial body of research that suggests that juveniles are unable to understand the language typically used in informing them of their rights, the approach that defendant advocates in reliance upon this information lacks support in the precedent of the United States Supreme Court or of this Court. On the contrary, as we have already noted, the United States Supreme Court has explicitly held that the totality-of-the-circumstances test for determining the validity of waivers of a defendant's *Miranda* rights is equally applicable to adults and juveniles, see *Fare*, 442 U.S. at 725, 99 S. Ct. at 2572, 61 L. Ed. 2d at 212, with a juvenile's age being a relevant, but not determinative, factor in the required analysis. Nothing in the record that has been presented for our consideration tends to show that the trial court failed to properly incorporate evidence concerning defendant's age or his linguistic and educational status into the required totality-of-the-circumstances evaluation.

Justice BEASLEY dissenting.

In *Saldierna I*, I dissented because defendant's statement, "Um, [c]an I call my mom?", was an unambiguous invocation of his right to have a parent present during questioning. *See State v. Saldierna* (*Saldierna I*), 369 N.C. 401, 409, 794 S.E.2d 474, 479 (2016) (Beasley, J., dissenting). Upon this unambiguous invocation, law enforcement should have immediately ceased questioning and not resumed until defendant's mother was present or he reinitiated the conversation. *See id.* at 412, 794 S.E.2d at 481 (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386 (1981)). Defendant did not knowingly, intelligently, and voluntarily waive his right to have his mother present—rather, he unambiguously invoked that right. Thus, for the reasons stated in my dissent to *Saldierna I*, I respectfully dissent.